[Civ. No. 7014. Third Dist. May 19, 1944.]

DONALD McCLAIN, Appellant, v. BERCUT-RICHARDS
PACKING COMPANY (a Corporation), Respondent.

Thomas B. Leeper for Appellant.

Downey, Brand & Seymour and Morgan V. Spicer for Respondent.

ADAMS, P. J.—This is an action to recover a balance alleged to be due to plaintiff for pears sold to defendant during the canning season of 1941. Plaintiff in his complaint alleges that he entered into a contract to sell to defendant what he describes as "hail damaged" pears, at $45 per ton, that defendant paid $45 per ton for a portion of the fruit delivered, but allowed only $38.50 per ton for the balance because same was "hail damaged"; and plaintiff contends, first, that defendant was bound by the contract to pay $45 per ton for all the pears delivered, and, second, that it is estopped from claiming that the contract provided that the pears should be free from "hail damage." The contract, copy of which is attached to the complaint as an exhibit, was the standard form adopted by the Canners League of California and recites that the seller has sold, and the buyer has bought, "upon the terms and conditions expressed below and on the back hereof, the quantity, quality and variety hereinafter specified of fruit . . ." Two hundred and fifty tons more or less, Bartlett Pears, at $45 per ton, inches in diameter not less than 2⅜, "10% Tolerance Prorate Grade." On the back of the contract appears what plaintiff refers to as a "hidden" clause, which provides that: "1. Seller shall deliver, at point of delivery, promptly after harvesting, all fruit covered by this contract of good shape, quality, and in good condition for canning, at the state of maturity Buyer may require, free from doubles, worms, scab, frost rings, hail or rain damage, red streaks in flesh, windfalls, split pits, hard-end, black-end, mildew, decay, water berries, Spanish measles, sunburn, cracks, gum, parasites, fungi, bruises, spray residue, or other imperfections, and all fruit shall be of a color and texture suitable for canning into Choice grade as such Choice grade is generally understood in the canning trade. . . . (d) No. 1 Pears shall be 2⅜ inches or more in diameter, shall produce two perfect peeled halves and shall be of a length not less than 1¼ times the diameter of the Pear."

Plaintiff's theory appears to be that the foregoing contract was one for the sale of pears of a "Hail Damaged

Grade," and not "Prorate Grade" as recited therein. He alleged that defendant is estopped from denying this or from relying upon the so-called hidden clause in the contract because it knew at the time the contract was entered into that plaintiff's pears were damaged by hail, that the contract form was furnished by defendant, that the provision that the pears should be free from hail damage was printed on the back of the contract in very small type and was not called to plaintiff's attention, that plaintiff did not know that it formed a part of said contract, that defendant led plaintiff to believe that no such provision was in the contract, that just prior to the execution of the contract plaintiff and defendant inspected plaintiff's orchards and defendant was informed that hail damaged pears were the only pears that plaintiff had to sell, that defendant made a thorough inspection of said crops and commented on the fact that the pears were badly hail damaged and that in view of said hail damage he would pay but $45 per ton for same; also that at the time of the execution of the contract defendant told plaintiff that they were governed by the prorate regulations relating to Bartlett pears for the year 1941 which governed the kind of hail damaged pears that could be delivered to the canneries, and that said regulations and the words "10% Tolerance Prorate Grade" meant that defendant was buying plaintiff's hail damaged pears that could pass inspection. Plaintiff then alleged that he believed the said representation of defendant and was induced thereby to sign the contract; that he could have sold said pears to other parties for $45 a ton, and that he would not have entered into said contract with defendant if defendant had not led him to believe that hail damaged pears was the subject of said contract; also that the contract was executed under and pursuant to the Agricultural Prorate Act [Stats. 1933, p. 1969, as amended; Deering's Gen. Laws, 1937, Act 143a], and the 1941 grade regulations on canning Bartlett pears as approved by the authorities of the State Department of Agriculture, and that all of the provisions of said act and said regulations were by law made a part of said contract.

Defendant answered and admitted the execution of the contract, but alleged that the Department of Agriculture had provided two grades of pears which could be sold to canneries, said grades being No. 1 or "Prorate Grade," and "Hail Damaged Grade"; that No. 1 or prorate grade was the

grade contracted to be sold by plaintiff, but that the principal grade delivered by plaintiff was the hail damaged grade. It admitted that it had received pears of hail damaged grade, known by it and by plaintiff to be such, alleged that it had paid $45 a ton for such pears of prorate grade as had been delivered to it, and that by subsequent agreement between it and plaintiff it had agreed to pay $38.50 per ton for the pears of hail damaged grade delivered to it. It denied the matters alleged by plaintiff to constitute estoppel.

Trial was had before the court sitting without a jury, and at the conclusion of plaintiff's testimony a motion by defendant for a nonsuit was granted. A judgment dismissing the action followed, and this appeal was taken therefrom.

■ The record before us shows that plaintiff, in support of the allegations of his complaint, called Charles T. McAllister, agent for defendant, who had negotiated with plaintiff for the purchase of the pears and signed the contract for defendant, and examined him as an adverse witness. He also testified in his own behalf. The testimony of plaintiff does not differ materially from that of McAllister. Both stated that prior to the execution of the contract they had inspected plaintiff's orchards and noted hail damage to the fruit, and it is obvious from their testimony that what was purchased by defendant was fruit that had been, to some extent at least, damaged by hail. Neither testified, however, that the contract covered or was intended to cover pears of the "Hail Damaged Grade." On the contrary, both testified that the language of the contract, "10% Tolerance Prorate Grade," meant that the pears were to be No. 1 or Grade A pears with a tolerance or allowance of 10 per cent for damage by hail. Plaintiff himself stated:

"Well, he made the contract out and before I signed it I said, 'How about this hail damage?' He said, 'The 10 per cent tolerance takes care of that.' He said, 'That's what the Prorate Board set that up for, so that you could ship that hail damage.'

. . . . . . . . . .

"Q. Now, I will show you the contract here: Here is the contract you signed. Now what portion were you referring to a moment ago——

"A. (Interposing) This 10 per cent tolerance.

"Q. What was said, what did he tell you about that?

"A. That that took care of the hail damage grade. In the past all contracts had been made out prorate grade, which is Number One, and this 10 per cent in addition to the prorate grade took care of that.

"THE COURT: . . . Did I understand you to say that in the past those contracts provided for Grade A?

"WITNESS: Prorate grade.

"THE COURT: And later on they liberalized the contract by allowing a 10 per cent tolerance, is that what you said?

"A. This is the Prorate Board. You see the canneries cannot turn around and buy a cull, according to the Prorate; this set up by the State; they have to buy the grade set up by the Board.

"MR. LEEPER: Q. And what was this change made in 1941?

"A. Well, due to the extensive hail damage throughout, not only on this river, why they changed this law to take in hail damage so that a limited amount of pears not too badly hail damaged could be canned.

.    .    .    .    .    .    .    .    .    .    .

"MR. LEEPER: The 10 per cent tolerance let them buy up the hail marked pears.

.    .    .    .    .    .    .    .    .    .    .

"[WITNESS]: A. Well, just at the time of the contract he told me what the 10 per cent included, that it was to get the hail damaged pears through the grade.

.    .    .    .    .    .    .    .    .    .    .

"A. He told me that the 10 per cent would take care of this hail damage grade and then he went on to explain the depth that would be allowed and how many hail marks per pear."

Mr. McAllister testified that he and plaintiff figured that the 10 per cent tolerance on the Prorate Grade would take care of any hail damage plaintiff had, but that it ran heavier than 10 per cent—which appears to be conceded by plaintiff himself.

We find nothing in the testimony that gives any significance to the so-called hidden clause in the contract. There is no evidence that the reduced price paid for a portion of the fruit was due to the provision in the clause that fruit should be free from hail damage, and, we might add, that plaintiff did not testify, as alleged in his complaint, that he was in ignorance of this provision or that defendant led

him to believe that there was no such provision therein. It sufficiently appears that both parties knew that plaintiff's pears had suffered from damage by hail but that they both believed or thought that, with the 10 per cent tolerance allowed for such damage, the fruit would measure up to the Number One, Grade A, or "Prorate Grade" provided in the contract.

Nor does the evidence show facts sufficient to constitute an estoppel. It is said in 10 California Jurisprudence, at pages 626, 627: "The whole office of an equitable estoppel is to protect one from a loss which, but for the estoppel, he could not escape. The vital principle of equitable estoppel, it has been said, is that he who by his language or conduct leads another to do what he would not otherwise have done shall not subject such person to loss or injury by disappointing the expectations upon which he acted. Such a change of position involves fraud and falsehood, and the law abhors both. In general, four things are essential to the application of the doctrine of equitable estoppel: first, the party to be estopped must be apprised of the facts; second, he must intend that his conduct shall be acted upon, or must so act that the party asserting the estoppel had a right to believe it was so intended; third, the other party must be ignorant of the true state of facts; and fourth, he must rely upon the conduct to his injury."

There is no evidence here that plaintiff was led by any language or conduct of defendant to do something which he would not otherwise have done, that defendant by any act or omission, intentionally and deliberately, or at all, led plaintiff to believe anything to be true which he thereafter attempted to falsify, or that plaintiff was ignorant of the true state of affairs. Plaintiff did not testify that he could have sold his pears to anyone else for a better price than was paid him by defendant, or that the price paid for the fruit damaged in excess of the 10 per cent tolerance was not a fair price therefor. He did state that prior to his negotiations with McAllister he had had an offer of $42.50 per ton for the pears from one orchard, but that defendant's offer was to buy the fruit from all of his land. He did not testify that defendant represented to him that his pears would pass inspection by the inspectors for the state in excess of the 10 per cent tolerance, or that he would not have entered into

the contract if he had not been led to believe that he was selling pears of the "Hail Damaged Grade" instead of Prorate Grade with 10 per cent tolerance.

We are satisfied that giving plaintiff's evidence its fullest effect it shows that he knew what the words "Prorate Grade" used in the contract meant, that he entered into the contract with a full understanding that it was for fruit of Prorate and not Hail Damaged Grade and that the "10% tolerance" meant that hail damage to the pears which were otherwise to be of No. 1 grade was not to exceed 10 per cent.

Our attention is called to nothing in the Agricultural Prorate Act nor do we find anything in the Grade Regulations of 1941 approved by the Agricultural Prorate Advisory Committee and the Director of Agriculture, which aids plaintiff. Those regulations provided that the committee *might* limit the delivery of Bartlett pears for canning by excluding those of quality below the following specifications, to wit: "Pears which are hand picked (1), firm (2), fairly well formed (3), free from scald, hard end, black end, internal break down, decay, worms and worm-holes, and from damage (4) caused by broken skins, limbrubs, sprayburn, sunburn, scab, russeting, bruises, hail, frost, drought spot, disease, insects, or by mechanical or other means." They further provided that " 'Damage' means any injury or defect which materially affects the canning quality of the fruit. Pears showing surface blemishes shall be considered damaged when the injury cannot be completely removed in the ordinary process of paring for commercial use. Peeling shall not be over $\frac{1}{8}$ of an inch in thickness. Due to the marking of pears by hail in 1941, pears so damaged *shall be permitted to be delivered for canning purposes during the 1941 season,* provided such pears shall not have more than three hail marks one-eighth of an inch or more in depth, and of these not more than one hail mark may be more than one-eighth of an inch but not more than three-sixteenths of an inch in depth, and provided also that such pears be offered for inspection in separate lots and be certificated as hail damage pears, and otherwise meet the grade requirements of the Program. . . . In order to allow for variations incident to proper grading and handling, not more than 10%, by weight, of the pears may be below the requirements of the specifications. . . ." (Italics ours.)

Apparently the contract in controversy was drawn to conform to those provisions, but the hail damage to plaintiff's pears was found, on inspection, to exceed the 10 per cent allowance for variation.

The judgment is affirmed.

Peek, J., and Thompson, J., concurred.