[Civ. No. 26714. Second Dist., Div. Two. May 13, 1963.]

VICTOR R. MILLER, Plaintiff and Respondent, v. JACK L. RAU, Individually and as Trustee, etc., Defendant and Appellant.

Leo K. Gold for Defendant and Appellant.

Hal L. Coskey for Plaintiff and Respondent.

FOX, P. J.—Plaintiff Victor R. Miller brought an action for money and an accounting against defendant-appellant Jack L. Rau (individually and as trustee of Aviation Export Company, Ltd., Inc.) as well as against other defendants who are not involved in the instant appeal. While there is no real disagreement between the parties as to the facts involved, it is the proper legal significance of these facts which forms the basis of the disagreement on appeal. The dispute arose out of the results of several years of commercial activity involving some World War II airplanes; in substantially chronological order, the facts may be summarized as follows:

During World War II, plaintiff Miller, an employee of the Lockheed Aircraft Corporation in England, became familiar with an aircraft designated as "AT-6." In 1947 he entered Cambridge University to study law,[1] and while there learned that there were some AT-6 aircraft at an airbase in Africa. Beginning in 1947, and continuing through 1953, Miller continued to inquire as to the availability of the AT-6's for purchase. In 1953, the British Air Ministry advised him that the planes were to be sold.

In September of that year, respondent and Aviation Export Co., Ltd. (hereinafter referred to as "Aivex") entered into an oral agreement of joint venture, which provided that Miller agreed to purchase the aircraft in England and then go to Africa to prepare the aircraft for shipment to the United States. Aivex agreed to contribute the capital necessary to pay: (1) the expenses of Miller's trip; (2) costs involved in the purchase; (3) freight charges for shipping the planes from Africa to Florida; and (4) selling costs involved in getting the aircraft to the subsequent buyer.

Miller and Aivex agreed that the net profits of their venture would be distributed 50 per cent to Aivex and 50 per cent to Miller. The term "net profits" was agreed to mean the selling price less only the four costs above set forth.

In April 1954, Miller and Aivex orally agreed to reduce Miller's share in the net profits from 50 per cent to 25 per cent. The agreement was then reduced to writing.

---

[1]Plaintiff became a member of the English Bar in 1952.

Miller went to England in October of 1953 and purchased 25 of the AT-6's for $1,900 each, or a total price of $47,500. Title to the aircraft was taken in the name of Aivex for convenience only.

After the purchase Miller flew to Southern Rhodesia where the aircraft were located, and began preparations for their shipment to the United States, all of which preparations were completed by December 1 except for the loading of the planes on railroad flatcars.

To raise the funds it had committed to the venture, Aivex entered into a limited partnership agreement on December 3 with one Louis Cohen whereby Aivex was general partner and Cohen was silent partner. Cohen was, however, actually acting both for himself and for one David Bright, with the latter as a silent partner.[2]

Defendant Rau, who is appealing in the instant action, is an attorney practicing in Beverly Hills, who represented Cohen and Bright in negotiating the limited partnership agreement and who subsequently represented the limited partnership. At no time did Rau represent either Aivex or Miller. Miller first learned of the limited partnership agreement in January 1954, when, while he was still in Africa, he received a copy of the articles of limited partnership.

When Miller returned to the United States in March of 1954, he had a conference with Rau and the principals of Aivex. Miller, who objected to the limited partnership agreement, claimed not to be bound by it. Miller told Rau that he (Miller) had the interest of a joint venturer in and to the aircraft and asserted that the limited partnership was attempting to deal with property in which he (Miller) had an owner's interest.

In July of 1954 Miller brought an action in California against Aivex and others (but not Rau) for a declaration of his rights in and to the 25 AT-6's. By a letter dated August 4, 1954, Miller (through his attorneys) notified Rau of the pendency of that action; he further cautioned Rau that none of the proceeds arising from the sale of the planes was to be disbursed without the written approval of Miller.

One June 21, 1955, a judgment was rendered in that action,

[2]Under the limited partnership agreement, Cohen was to advance $50,000 for which he would receive a stated percentage of the profits of the sale of the aircraft. A later agreement between Bright and Aivex modified the shares of Cohen, Bright and Aivex in the limited partnership in a manner not material to this appeal.

which decreed, *inter alia*, that: (1) Miller and Aivex were joint adventurers for the purchase of 25 aircraft, net profits to be divided 25 per cent to Miller and 75 per cent to Aivex; (2) Miller and Aivex had joint control of the aircraft; (3) "net profit" was the sale price of the planes less the costs set forth *supra*; (4) Aivex was obligated to match its capital against Miller's services and time, and any item of cost incurred to secure such capital was not to be charged or deducted from the selling price of the aircraft to determine net profit.

While the action was pending, the 25 AT-6 aircraft were sold to Aerodex, Inc., a Florida firm, for a gross price of $199,000. Aerodex made three separate payments: (1) $70,-355.14, paid to Bright on November 4, 1954, (2) $74,-980.94, to Rau and Aivex on the same date; and (3) $38,064.25 to Rau and Aivex on December 8, 1954. The three payments totalled $183,400.33.[3] To this figure should be added $935.75 (proceeds from an insurance claim for damages to aircraft), giving a total gross proceeds figure of $184,336.08. The trial court found that the costs to be deducted from the sale price (in order to obtain "net profits") totalled $63,276.16.[4] The "net profits," as that term was used in the original Miller-Aivex joint venture agreement, amounted to the total gross proceeds, $184,336.08, less the costs, $63,276.16, or a difference of $121,059.92. Miller's share of these "net profits," i.e., 25 per cent of $121,059.92, amounted to $30,264.98.

Remittances (2) and (3), payable to Rau and Aivex, were endorsed by Aivex and delivered to Rau, who thereafter had sole custody and control of the funds, all of which were deposited by Rau in the trust account of the law firm of which he was a partner. Rau did not notify Miller or his attorneys that he had received the funds. Rau distributed the funds by check in varying amounts to Aivex, which latter firm planned to, and did, endorse them over to persons to whom Aivex was indebted in the particular amounts.

The trial court, having found that Miller was entitled to receive as his share from the sale of the aircraft the sum of

[3] The difference between the selling price of $199,000 and the total sum remitted by Aerodex, $183,400.33, constituted reimbursement of Aerodex for transportation charges advanced by it, for parts which were missing from the aircraft, and for damage to the aircraft.

[4] These "costs" were determined by the trial court to constitute the sum of the figures for those items set forth at page 72, *supra*, which were agreed by Miller and Aivex to be the amounts deducted from the proceeds in order to arrive at a "net profits" figure.

$30,264.98, rendered judgment in this amount in favor of Miller against Rau, plus interest from July 21, 1955.

Appellant has made 11 assignments of error in his brief on appeal; these may be divided into four basic areas: (1) the effect of Rau's disbursement of funds to Aivex with knowledge of the claim by Miller; (2) the effect of the judgment rendered in the action between Miller and Aivex; (3) computation of damages; and (4) the trial court's failure to make a specific finding regarding estoppel.

## DISBURSEMENT OF FUNDS

The trial court concluded that both Rau and Aivex converted Miller's interest in and to the 25 AT-6's and in and to the joint venture between Aivex and Miller. ▆ Appellant argues that such conclusion as to him is erroneous for the reason that he delivered the money to the person authorized to receive it, *viz.*, Aivex, under the terms of the limited partnership agreement between Aivex and Cohen. It is patently clear, however, that this agreement could have no effect on Miller's original and continuing interest as expressed in the joint venture agreement between Miller and Aivex. Miller did not participate in the limited partnership agreement; in fact, he did not even know of it until some time subsequent to its execution. ▆ The trial court held that Miller and Aivex were joint venturers with regard to the purchase and sale of the 25 AT-6's. It is axiomatic that no agreement by Aivex and a third party could modify Miller's interest thereby created. The trial court, therefore, properly held that "[t]he agreement of limited partnership between [Aivex and Cohen] . . . did not diminish or defeat . . . Miller's interest in and to [the AT-6's]. . . ."

▆ Since conversion is ". . . any act of dominion wrongfully exerted over another's personal property in denial of or inconsistent with his rights therein" (*Gruber* v. *Pacific States Sav. & Loan Co.*, 13 Cal.2d 144, 148 [88 P.2d 137]) and it is not necessary that ". . . there be a manual taking of . . . property [to have a conversion], since any wrongful assumption of authority over chattels, inconsistent with another's right of possession or, subversive of his vested interest therein amounts to conversion" (*Pilch* v. *Milikin,* 200 Cal.App.2d 212, 224 [19 Cal.Rptr. 334]), it cannot be said that the trial court was wrong in concluding that there had been a conversion of Miller's interest. ▆ "A joint proprietary interest and right of mutual control over the subject matter of [an] ⸎ ⸎ ⸎ enterprise or over the property engaged therein are

essential to a joint venture." (*Goldberg* v. *Paramount Oil Co.*, 143 Cal.App.2d 215, 220 [300 P.2d 329].)

■ Further, where members of a joint venture have appropriated the venture's assets to their own use and to the exclusion of another venturer, that latter innocent joint venturer may treat the matter as a conversion and sue for such. (*Pilch* v. *Milikin, supra.*)

■ Rau's alternatives on being given notice by Miller of (1) the latter's claimed interest; (2) pendency of litigation; (3) Miller's claim of not being bound by the Aivex-Cohen partnership agreement; (4) Miller's notice that disbursement of sale proceeds required his written approval, were either (a) commencement of an action in interpleader, or (b) a decision on his (Rau's) own as to whom to distribute the proceeds. He chose the latter course, but in so doing he took the risk of having to pay the person rightfully entitled to the funds if it turned out that the person to whom the distribution was made was not rightfully entitled thereto. (*Cooper* v. *Spring Valley Water Co.*, 16 Cal.App. 17 [116 P. 298].)

Although the express question of Rau's duty upon receipt of notice of Miller's claim has apparently not arisen in California on facts similar to those in the instant case, courts in other jurisdictions have generally recognized the principle that where one receives money as an agent, to which his principal has no right, and where he receives notice not to pay to his principal prior to disbursement of the funds, an action for money had and received lies against such party. (See, e.g., *General Exchange Ins. Corp.* v. *Driscoll*, 315 Mass. 360 [52 N.E.2d 970].) ■ Although appellant argues that he had a duty to pay the funds to the partnership, the correct principle in the factual context of the instant case is expressed in *General Exchange Ins. Corp.* v. *Driscoll, supra*, where the court states (52 N.E.2d at p. 973): "There was nothing in the defendant's status as attorney for [his client] . . . which made it his duty to pay to his client money *which he knew* . . . belonged to plaintiff. [Citations.] The defendant had complete control over the money. It was his duty to hold for the plaintiff so much of the proceeds . . . as represented the plaintiff's known interest in it." (Italics added.) Not only would the *General Exchange Ins. Corp.* rule belie Rau's claim of duty to remit to Aivex, it would impose on him a *positive duty* to hold 25 per cent of the net profits for Miller. The reasoning behind such a rule being sound and consistent with fairness, it should be applied in this case.

(Accord: *Tillman* v. *Bungenstock*, 185 Mo.App. 66 [171 S.W. 938, 939]: "But where a third party has paramount title to the money in the hands of the agent, and notifies the latter of his claim, if the agent nevertheless pays the principal, he is liable to the true owner"; *Sims* v. *Brown*, 6 Thomp. & C. (N.Y.) 5, affirmed 64 N.Y. 660; see also, Note 2 L.R.A. N.S. 657.) *Dunn* v. *Vannerson*, 5 Miss. (7 How.) 579, cited by appellant as the only case involving an attorney as the agent, does not reach the question here presented.

Finally, appellant attempts to escape liability by asserting that he was legally entitled to deal with the property of the Miller-Aivex joint venture. Authority cited by him, however, concerns situations where the rightful owner of property has conferred a right of possession on the defendant either by a contract of pledge or some other agreement, or where the defendant has obtained such a right in law, e.g., by statute. Such is not the situation in the case at bar. ▉ It has long been the law in this state that a person is guilty of conversion if he sells the property of another without authority from the owner, notwithstanding that he acts under the authority of one claiming to be the owner and is ignorant of the latter's lack of title. (*Swim* v. *Wilson*, 90 Cal. 126 [27 P. 33, 25 Am.St.Rep. 110, 13 L.R.A. 605].) *A fortiori*, this is true where he has been informed of the other's claim of title. While Rau did not *sell* the funds belonging to Miller, he nevertheless dealt with them in such a way as to just as effectively prevent their being obtained by Miller; the same considerations should lead us to the conclusion that the *Swim* rule should apply. (Cf. *Stiller* v. *Rogers*, 69 Cal.App.2d Supp. 805 [159 P.2d 457], where funds which an attorney took for his fee were in fact stolen, he was required to surrender them to the rightful owner after the court held that the attorney should be charged with constructive notice of the source.) ▉ Appellant by reason of Aivex's instructions relative to checks knew that none of the funds was intended to be paid to Miller; therefore, payment by Rau to Aivex certainly did not satisfy his obligation to Miller. (See *Hill* v. *Maryland Casualty Co.*, 28 Cal.App. 422 [152 P. 953].)

PRIOR JUDGMENT BETWEEN AIVEX AND MILLER

Appellant argues that the trial court committed prejudicial error by treating the judgment of the Miller-Aivex declaratory relief action as res judicata against appellant. While *Perkins* v. *Benguet Consolidated Mining Co.*, 55 Cal.App.2d 720 [132 P.2d 70], would seem to hold against appellant's

contention if in fact the court had treated the prior judgment as res judicata against him, that point need not be dealt with. The trial court did *not* consider that the prior judgment was res judicata, but treated it merely as evidence of the amount which respondent was entitled to receive from the joint venture. The judgment was properly evidence of the agreement between respondent and Aivex. (Code Civ. Proc., § 1851; *Ellsworth* v. *Bradford,* 186 Cal. 316 [199 P. 335].)

### COMPUTATION OF DAMAGES

 Appellant appears to argue that, since he handled only a given percentage of the total gross proceeds paid by Aerodex for the AT-6's, his liability should be limited to that same percentage of Miller's share of the net profits. He argues that, in effect, the trial court found him guilty of converting the amount paid by Aerodex directly to Bright. In so arguing, however, appellant misconstrues the effect of the trial court's judgment. Appellant was found to have converted not the total proceeds from Aerodex, but Miller's interest therein. The portion of the total proceeds which passed through Rau's hands exceeded the amount of Miller's interest; it therefore follows that Rau could have, but chose not to, retain the full amount of Miller's interest in the venture (i.e., $30,264.98) when he was informed by Miller of the latter's claim. It is this amount, and no more, for which the trial court adjudged Rau to be liable.

 Appellant also argues that Miller was entitled to only a percentage of profits as defined in the limited partnership agreement between Cohen and Aivex. He claims that Miller, at most, is entitled to 25 per cent of the net profits that Aivex was to receive *in its deal with Cohen.* As we have pointed out, however, Cohen entered the picture after the original agreement between Miller and Aivex and without Miller's knowledge or consent. Any such agreement between Aivex and Cohen cannot diminish Miller's interest. Although Miller agreed to reduce his original share of 50 per cent to 25 per cent, it was still a percentage of net profit from sale as defined in the Miller-Aivex agreement.

 Finally, on the damages question, appellant assails part of the interest charged to him by the trial court. He seems to claim that interest should have been charged only from the date of the judgment, rather than from the date Rau was notified that Miller had prevailed in the declaratory relief action against Aivex. He would have this court read into the law a requirement that the one charged with interest

actually *use* the money, which he is later held to have wrongfully withheld from the person entitled to it. We can find no authority to support this proposition. It would certainly be a strange rule which would relieve a defendant of the obligation of paying interest on wrongfully withheld funds where he has turned them over to other persons not entitled to them rather than using them himself. The award of interest is proper under the authority of section 3287[5] of the Civil Code. (See, e.g., *Petersen* v. *Lyders,* 139 Cal.App. 307, 309-310 [33 P.2d 1032]; *Cockrill* v. *Murphis,* 68 Cal.App.2d 184, 189 [156 P.2d 265].)

The computation used by the court appears thorough, competent, and consistent with the agreement upon which it is based as well as the applicable law. We can find no reason for upsetting it.

### FINDING RE ESTOPPEL?

 During trial, appellant requested permission to file an amended answer setting up the affirmative defense of estoppel. Permission was granted by the trial court. Appellant now argues that he should be granted a new trial because the findings of fact and conclusions of law omit any specific language as to estoppel.

 Four elements are essential before estoppel is present: (1) a representation of fact with intent that it will be acted upon; (2) the party to be estopped must know the true facts; (3) the innocent party must be ignorant of the true facts; and (4) the innocent party must reasonably rely to his injury on the representations. (*McClain* v. *Bercut-Richards Packing Co.,* 64 Cal.App.2d 420 [148 P.2d 907]; 18 Cal.Jur.2d, Estoppel, § 5; Code Civ. Proc., § 1962, subd. 3.) If estoppel is to be relied on as a defense, these elements must be pleaded. (*Gressley* v. *Williams,* 193 Cal.App.2d 636 [14 Cal.Rptr. 496]; *Fleishbein* v. *Western Auto Supply,* 19 Cal. App.2d 424 [65 P.2d 928].) A search of the pleadings shows that appellant failed to satisfy this latter requirement. There is no allegation, for example, that appellant was unaware of the action against Aivex or that he believed that the action against Aivex was intended to relieve him of any responsibility to respondent. In fact, the evidence is

---

[5]Section 3287, Civil Code, reads in pertinent part: ''Every person who is entitled to recover damages certain, or capable of being made certain by calculation, and the right to recover which is vested in him upon a particular day, is entitled also to recover interest thereon from that day, . . .''

to the contrary. ▮ Further, as to proof, there is no evidence that appellant was led by any action or inaction of respondent to do something which he would not otherwise have done or that he relied on any of the facts or representations of respondent.

▮ Even if estoppel be considered sufficiently pleaded, still under the evidence offered, the trial court's findings are sufficient to make any further specific finding of no estoppel superfluous. The findings state, *inter alia,* that appellant had notice of respondent's claim prior to receipt of any funds by appellant, and that appellant had actual knowledge that Aivex did not intend to pay respondent any part of the funds which appellant distributed to Aivex. ▮ Patently, in any event, appellant has not been harmed by any failure of the trial court to make a specific finding regarding estoppel for under the evidence this finding would of necessity be against him. It is therefore unnecessary to add findings of fact and conclusions of law regarding estoppel as suggested by respondent.

The judgment is affirmed.

Ashburn, J., and Herndon, J., concurred.

A petition for a rehearing was denied June 10, 1963, and appellant's petition for a hearing by the Supreme Court was denied July 10, 1963.