[No. G019626. Fourth Dist., Div. Three. Apr. 21, 1999.]

FARMERS INSURANCE EXCHANGE et al., Plaintiffs and Respondents,
v.
MICHAEL F. SMITH, Defendant and Appellant.

COUNSEL

Michael F. Smith, in pro. per., for Defendant and Appellant.

Michael R. Lea for Plaintiff and Respondent Farmers Insurance Exchange.

Paul T. Locke for Plaintiff and Respondent Colonial Penn Insurance Company.

OPINION

**SILLS, P. J.**—The central question in this case is whether an insurer can, in effect, press-gang a policyholder's personal injury attorney into service as a collection agent when the policyholder receives medical payments from the insurer and then later recovers from a third party tortfeasor. As one might guess from the verb "press-gang," the answer is no. The theory put forward by the insurer here amounts to a genteel form of involuntary service as a money collector. A few basics need to be kept in mind: An insurer does not detrimentally rely on anything when it makes first party medical payments to one of its policyholders as a result of an auto accident. It is just doing what it contracted to do. Nor is a policyholder's *attorney* unjustly enriched when he or she remits money to the client that the client is *entitled to* under the attorney-client agreement. The contractual relationship created by an insurance policy is between the insurer and the insured, not the insured's attorney. The simple fact that an insurance policy obligates the *policyholder* to reimburse the insurer for first party medical payments later recovered from a third party does not create an independent obligation on the part of the insured's *attorney* to "insure"—for want of a better word—that the client lives up to his or her obligation. The attorney is not the client's keeper.

Two previous opinions have dealt with this precise factual situation, *Farmers Ins. Exchange* v. *Zerin* (1997) 53 Cal.App.4th 445 [61 Cal.Rptr.2d 707] and *Kaiser Foundation Health Plan, Inc.* v. *Aguiluz* (1996) 47 Cal.App.4th 302 [54 Cal.Rptr.2d 665], but reached diametrically opposite results. As explained below, we now follow the case which decided the question in favor of the policyholder's attorney, *Zerin.* As the *Zerin* court demonstrated, there are no considerations of either detrimental reliance or unjust enrichment which support imposing an equitable lien on the payments from the third party tortfeasor. The case which sided with the insurer, *Aguiluz,* took the preexistence of an equitable lien for granted, and never really considered whether such a lien should be imposed in the first place. Accordingly, we reverse the judgment in favor of plaintiffs Farmers Insurance Exchange and Colonial Penn Insurance Company. We direct that a new judgment be entered in favor of the defendant, Michael F. Smith.

## Facts

The parties stipulated to these facts, which they submitted to the court at trial: Michael Smith represented 18 persons, including drivers and their passengers, injured in various automobile accidents between 1991 and 1992. As their attorney, he first filed claims on their behalf for reimbursement of medical expenses from the drivers' automobile insurance carriers—Farmers Insurance Exchange and Colonial Penn Insurance Company—which paid out $47,057.45 and $24,146.50, respectively, in medical payments pursuant to the policies. Smith then pursued claims against the third party tortfeasors in each case.

In letters mailed to Smith, both Farmers and Colonial Penn advised him and his clients that the policies contained language allowing for reimbursement of any payments made by the insurer which the insured subsequently recovered from a third party.[1] Upon settling each of the 18 claims against third party tortfeasors, Smith subtracted his fee plus certain costs, then disbursed the remaining funds to his clients. Neither Smith nor the insureds reimbursed Farmers or Colonial Penn for the medical payments. Thereafter, Farmers and Colonial Penn filed a complaint against Smith for, inter alia, conversion and imposition of a constructive trust, asserting a theory of equitable liens on the settlements. They did not seek reimbursement from Smith's clients. After the parties submitted on the trial briefs, the court awarded $47,057.45 to Farmers and $24,146.50 to Colonial Penn. From the ensuing judgment Smith now appeals.

## Discussion

### *Common Fund Theory Inapplicable*

■ Preliminarily, we must first deal with the idea that the judgment may be affirmed on the basis of the "common fund" theory. The theory is an equitable rule that "permits surcharging a common fund with the expenses of its protection or recovery, including counsel fees." (*Estate of Stauffer* (1959)

---

[1]Both letters made their point by quoting from the relevant insurance policy. The letter from Farmers stated: "Condition five (5) of your policy, 'Our Right to Recover Payment,' says in part, 'When a person has been paid damages by us under this policy and also recovers from another, the amount recovered from the other shall be held by that person in trust for us and reimbursed to us to the extent of our payment.' [¶] We intend to exercise the above 'Right to Recover Payment'." The letter from Colonial Penn stated: "The rights of recovery an insured person has against any other person or organization will pass to us when we make any payment . . . . We are entitled to the insured person's rights of recovery to the amount of our payment under any coverages listed above. The insured person must do whatever is necessary to protect these rights. This includes signing legal papers and delivering them to us. The insured person must not do anything after a loss to weaken these rights."

53 Cal.2d 124, 132 [346 P.2d 748]; e.g., *Lee* v. *State Farm Mut. Auto. Ins. Co.* (1976) 57 Cal.App.3d 458, 469 [129 Cal.Rptr. 271].) The trial court conceded that in applying the common fund theory to the facts of this case "no body has ever done that before."

There is a reason no one had ever applied the common fund theory to insurance reimbursement law before. It doesn't fit. Smith was never even a passive beneficiary of either the money the policyholders received in first party medical payments or the money they received from third party tortfeasors in compensation for their injuries. His only claim in either case was against the policyholders—not the insurers or the tortfeasors—for services rendered to the policyholders. He earned that money *from them*, and it would be a gross mischaracterization of the theory to think that there is a "common" fund just because money is ultimately used to pay for an attorney's services. It is rather like saying that a bank should have a claim on an employee's paycheck because he or she got paid from funds that a struggling employer should have used to repay a bank loan—after all, the money came from a "common source." Obviously no modern economy could function if that theory were adopted by courts of equity. The current case is no different, because applying a common fund theory ignores the basic contractual relationships set up by the parties themselves.

### Equitable Lien Theory Inapplicable

■ We now turn to the main battlefield in this case, the equitable lien theory. The two published California cases which have previously considered the issue are *Kaiser Foundation Health Plan, Inc.* v. *Aguiluz, supra,* 47 Cal.App.4th 302 (*Aguiluz*), and *Farmers Ins. Exchange* v. *Zerin, supra,* 53 Cal.App.4th 445 (*Zerin*). *Aguiluz* held that the attorney's negotiations in attempting to settle the insurance company's reimbursement claims *did* create an equitable lien on proceeds received from third party tortfeasors. By contrast, in *Zerin*, the court held that the reimbursement provisions of the policies alone did not create an equitable lien on settlement proceeds just because the attorney was given notice of those reimbursement provisions. Of the two cases, there is no question that *Zerin* is the one to follow. It squarely confronted the question of *whether* an equitable lien should be created in the first place and answered that question directly—no.[2]

The *Zerin* court began with the premise, which neither it nor we see any reason to question, that a mere promise to pay is not enough to create an

[2]There is a semantic trap that is rather too easy for courts to fall into when dealing with equitable liens. By speaking of them as if they had some independent existence apart from what courts do, there is a tendency not to ask whether they are appropriate as an equitable *remedy* in the first place. More on that anon.

equitable lien on a fund, at least when there are no considerations of either detrimental reliance or unjust enrichment. (See *Zerin, supra,* 53 Cal.App.4th at pp. 454-455.) It then noted that in the specific context of insurer reimbursement,[3] the insurer's obligation to pay medical benefits in the first place exists regardless of any third party recovery—so there is no detrimental reliance on the part of the insurer. (*Id.* at p. 456.)[4] Nor do considerations of unjust enrichment justify imposing (or creating) a lien: There is no reason the insurer cannot seek reimbursement from the parties who really are unjustly enriched—the policyholders who collected for the same injury from both the insurer and the third party tortfeasor. (See *ibid.*) As for a policyholder's attorney, there is no unjust enrichment because he or she has never promised he would protect the insurer's interests. (See *ibid.*) In light of the facts of the case, the *Zerin* court tartly assessed the insurer's claim this way (though it did not use a phrase like "press-gang"): "[T]his matter appears to be nothing more than an attempt by Farmers to avoid the necessity of seeking repayment from the parties primarily responsible by simply giving notice to their legal representative." (*Id.* at pp. 456-457.)

*Zerin* did not directly confront *Aguiluz,* which, after all, reached a contrary result on the same facts. It merely included the *Aguiluz* case after an "accord" in a string citation after a quotation from another case (which is less on point and which we will discuss anon, *McCafferty* v. *Gilbank* (1967) 249 Cal.App.2d 569 [57 Cal.Rptr. 695]). (See *Zerin, supra,* 53 Cal.App.4th at p. 453.) After the citation to *Aguiluz,* the court included the words "equitable lien conceded" in a parenthetical reference, suggesting, in a kind of minimalist, indirect way, that the *Aguiluz* case should not be followed because there the court never addressed the question of *whether* an equitable lien should be impressed on the proceeds.

---

[3]The *Zerin* court pointed out that an equitable lien is a right to subject property not in one's possession to a charge, and can arise in circumstances as varied as the kinds of contracts parties make. (See 53 Cal.App.4th at pp. 453-454.) The upshot is that whether an equitable lien should be "created" or "recognized to exist" is a highly fact-specific sort of question because each context has its own equitable considerations.

[4]This point requires a little qualification because, from an underwriter's point of view, there is a sense in which premium costs for insurance policies are, at least in small part, affected by what insurers are able to recoup in the way of overall subrogation or reimbursement claims. But that is a highly tenuous point when it comes to a specific claim, where the policyholder is injured and the insurer *must* pay the medical expenses regardless of the value of any claim for subrogation or reimbursement it might have. Just because a fire insurer might have a claim against an arsonist after a policyholder's house burns down doesn't mean that there is any *meaningful* detrimental reliance when the insurer pays the policyholder for the fire damage, even though, no doubt, the fact that the insurer generally can offset some of its losses with reimbursement and subrogation claims does contribute to marginally lower premiums. Our point is that in any given, specific case, the insurer has no choice but to pay the first party claim.

The *Zerin* court was right about *Aguiluz*. A complete explanation, however, requires a number of pages to do what the *Zerin* court implied in a few cryptic words. We provide that explanation so that future courts will have the benefit of our deliberations as to why we chose *Zerin* over *Aguiluz*.

### Why We Do Not Follow Aguiluz

### The Aguiluz Case Itself

The *Aguiluz* court began its analysis by setting up the sort of fork-in-the-road dichotomy between two seemingly conflicting ·appellate decisions which characterizes our own opinion here. The two cases were *Miller* v. *Rau* (1963) 216 Cal.App.2d 68 [30 Cal.Rptr. 612] (*Miller*) and *Brian* v. *Christensen* (1973) 35 Cal.App.3d 377 [110 Cal.Rptr. 688] (*Brian*). The *Aguiluz* court began with a premise based on the *Miller* case, namely that "an attorney on notice of a third party's contractual right to funds received on behalf of his client disburses those funds to his client at his own risk." (*Aguiluz, supra,* 47 Cal.App.4th at p. 305, fn. omitted.) From there the *Aguiluz* court elaborated on the theme of *notice*, based on a long quotation from *Miller*, which in turn was itself taken from a 1944 Massachusetts Supreme Court case, *General Exchange Ins. Corporation* v. *Driscoll* (1944) 315 Mass. 360 [52 N.E.2d 970] (*General Exchange*). The essence of the quotation is the articulation of a flat, unqualified rule: If an attorney is in possession of money which he or she *knows* partly belongs to someone else, the attorney has a "duty" to hold so much of that money as is represented by the person's known interest.[5] From there the *Aguiluz* court divined the "*Miller* rule" (i.e., really the *General Exchange* rule), which it saw manifested in a number of later cases, including those arising out of an ex-wife's agreement to forego collection of a lump-sum spousal support award in return for a split in the proceeds of certain personal injury litigation (see *McCafferty* v. *Gilbrank, supra,* 249 Cal.App.2d 569), and attorney fee arrangements when the attorney is later substituted out of the case (*Weiss* v. *Marcus* (1975) 51 Cal.App.3d 590 [124 Cal.Rptr. 297]; *Siciliano* v. *Fireman's Fund Ins. Co.* (1976) 62 Cal.App.3d 745 [133 Cal.Rptr. 376]). The *Aguiluz* court then administered the coup de grâce in light of the "*Miller* rule" by observing that the attorney in the case before it "knew about the reimbursement agreement his client had signed" and, in point of fact, had

---

[5]Here is the actual text of the quote from *General Exchange* which was used in *Miller* and which became the centerpiece of *Aguiluz*: " 'There was nothing in the defendant's status as an attorney for [his client] . . . which made it his duty to pay to his client money *which he knew* . . . belonged to plaintiff. [Citations.] The defendant had complete control over the money. It was his duty to hold for the plaintiff so much of the proceeds . . . as represented the plaintiff's known interest in it.' " (*Miller, supra,* 216 Cal.App.2d at p. 76, quoting *General Exchange, supra,* 52 N.E.2d at p. 973, all ellipses, brackets and italics original to *Miller*.)

negotiated with the insurer to settle his client's obligation for a lesser amount. (*Aguiluz, supra*, 47 Cal.App.4th at p. 307.) Accordingly, he lost: He was obligated to pay out of his *own pocket* money which his client owed the insurance company.

The balance of the *Aguiluz* opinion was mop-up. The court's remaining task was to demonstrate that the case which it had rhetorically juxtaposed against *Miller, Brian, supra*, 35 Cal.App.3d 377, was only seemingly inconsistent with *Miller*. The *Brian* court, said the *Aguiluz* court, never addressed the question of whether "the facts alleged in the complaint could support a claim of equitable lien under *Miller* and its progeny." (*Aguiluz, supra*, 47 Cal.App.4th at p. 308.) The *Brian* case arose out of a *statutory* obligation on the part of a client to reimburse Medi-Cal payments, and the court simply held that neither a third party beneficiary theory nor a fiduciary relationship could support a recovery against the client's attorney by the relevant state department. (See *Aguiluz, supra*, 47 Cal.App.4th at p. 308.) The department's director never argued that it could recover on a "claim of equitable lien under *Miller*." (*Ibid.*) The director's failure to raise the argument allowed the *Aguiluz* court to avoid the problem presented by the *Brian* case by noting that an opinion is not authority for points which are not " 'therein considered.'. . ." (*Ibid.*, citation omitted.)

We are not unmindful of the irony of the fact that we are about to distinguish *Aguiluz* on the same basis that *Aguiluz* distinguished *Brian*. Like *Brian, Aguiluz* never really confronted the question of whether courts should *create* or "impose" an "equitable lien" on a personal injury attorney's receipt of settlement proceeds because, as our extended discussion of the *Aguiluz* case should have made clear by now, the court assumed the existence of an equitable lien from the beginning, as if it were a piece of gum stuck on a dollar bill. As the *Aguiluz* court noted in a footnote: "Counsel does not dispute the appellate department's finding that the reimbursement agreement between [the insurer] and [the client] created an equitable lien *enforceable against [the client]*. His contention, rather, is that such a lien was not enforceable against himself." (See *Aguiluz, supra*, 47 Cal.App.4th at p. 305, fn. 1, italics in original.) Given the court's assumption of a *preexisting* equitable lien, the notice issue was dispositive.

An equitable lien is, after all, merely an equitable remedy which is available to accomplish justice in a given situation. The central but unstated premise on which the *Aguiluz* decision was based is that there is a per se rule that property in an attorney's control, which is *known* to be someone else's (like an earmarked dollar bill), fastens the attorney with a duty as a matter of equity to see to it that the property goes to its rightful owner, regardless of

the attorney's obligations to his or her client or the attorney's right to be paid.

Applying that idea does not make sense in the specific context of a personal injury attorney's receipt of settlement proceeds and the subsequent distribution of those proceeds to a client who may be obligated to reimburse an insurer. Essentially, the attorney is being forced to perform an unpaid service to the policyholder's insurer in a situation where there has been neither detrimental reliance on the part of the insurer nor unjust enrichment of the attorney—and, more importantly, the attorney's duties lie with the policyholder, not the potentially adverse policyholder's insurer. Indeed, it appears that the attorney in *Aguiluz* made a similar contention. He claimed there was no unjust enrichment *to him*. The *Aguiluz* court, however, refused to consider the argument. It based that refusal on the theory that it was resolving a conflict in the appellate department of the superior court, and the equitable issues concerning the attorney's own situation were beyond the scope of the limited review on which it had accepted transfer from the appellate department. (See 47 Cal.App.4th at p. 308, fn. 4.) In short, *Aguiluz* itself never addressed the core equities bearing on whether imposition of an equitable lien would be justified. The court just assumed the equities were on the insurer's side. To understand why the court made that (as we are about to show, erroneous) assumption, we must explore the Massachusetts decision, *General Exchange, supra*, 52 N.E.2d 970, which was the basis of the quotation in the *Miller* opinion on which *Aguiluz* relied.

### The Case That Was Relied On by the Case That Aguiluz Relied On

*Aguiluz*'s reliance on *Miller*, which relied on *General Exchange*, is rather reminiscent of the story of the husband who asked his wife why she always cut off the ends of the meatloaf she served for dinner. She answered that it was called for in a sacred family recipe handed down from her mother, who received it from her mother. When he inquired of her mother, she could provide no better explanation than that it was called for in the recipe given her by her mother. But when he inquired of the (now very aged) grandmother, he discovered that when she originally came up with the recipe, she simply didn't have a serving tray big enough to accommodate the meatloaf, and wrote the recipe down that way.

Most of the time, of course, precedent and stare decisis work well enough that courts do not have to reinvent a rule that was handed down many years before. However, as the *Miller-Brian* and *Zerin-Aguiluz* splits demonstrate, on the narrow question we confront today (involving insurance claims against policyholders' attorneys), there is still some foundational work to be

done. We are entitled, given the split in authority, to question why the ends of the meatloaf must still be cut off.[6]

Like *Zerin, Aguiluz* and the present case, *General Exchange* arose out of an insurer's claim against proceeds paid to its policyholder by way of tort litigation. In *General Exchange* the policyholder was in a car accident. The insurer paid the policyholder for his property damage and "took" from the policyholder subrogation agreements by which he essentially assigned his rights for damage to his auto to the insurer. (See *General Exchange, supra*, 52 N.E.2d at p. 971.) Later, the policyholder's attorney negotiated a settlement with the tortfeasor, and as in the present case, paid the entire balance to his client after taking his fee and paying expenses. (See *id.* at pp. 971-972.) The insurer sued the attorney, but the trial judge was unpersuaded, not believing that "equity and good conscience" supported the insurer's claim. (*Id.* at p. 972.)

The Massachusetts Supreme Court, however, had a different view of the equities involved, and it was in that context that it wrote the language, later quoted in *Miller* and *Aguiluz*, about the attorney's supposed "duty to hold for the plaintiff so much of the proceeds of the cause of action as represented the plaintiff's known interest in it." (*General Exchange, supra*, 52 N.E.2d at p. 973.)

The interesting thing about the *General Exchange* opinion is that, while the court made several references to "good conscience" as the ground of its decision, it never really explained *why* good conscience required imposition of an equitable lien. The requirement of good conscience wasn't so obvious to the trial judge, but the court never really explained its decision other than to cite a series of Massachusetts decisions, the common thread of which was that, yes, there are situations when an agent can be personally liable for actions involving a transaction on behalf of his or her principal. (See *Crohon & Roden Co.* v. *Rudnick* (1919) 232 Mass. 555 [122 N.E. 741] [plaintiff consigned hides to leather company; company's treasurer could be personally liable for breach of promise to turn over "identical checks received" from the sale of the hides]; *Coe* v. *Ware* (1930) 271 Mass. 570 [171 N.E. 732] [rejecting argument of new car salesman that he could not be personally liable for false statement that a particular model would not go down in price after a merger, and holding that an agent could be held liable for "false statements of fact as inducements" to a sale]; *Proctor* v. *Norris* (1934) 285 Mass. 161 [188 N.E. 625] [defendant participated in a scheme by one stockholder to deceive the other by paying off corporate debts with money

---

[6]It would be a different matter, of course, if the point had already been considered by the California Supreme Court.

from checks drawn on the plaintiff corporation's account, which defendant should have known was beyond the one stockholder's authority as treasurer of that corporation]; *Kennedy* v. *Shain* (1934) 288 Mass. 458 [192 N.E. 924] [real estate agent could be held personally liable in equitable replevin for converting plaintiff's furniture].)

Thus, other than to allude to the general idea that agents can be personally liable, plus a sarcastic reference in its statement of facts about the attorney's knowledge of the meaning of the word "subrogation,"[7] the *General Exchange* court never actually set forth the equities bearing on the case. *General Exchange* is thus not persuasive authority. But if the *General Exchange* court failed to confront the actual equities involved, that is at least one mistake we need not make now. The time has now come to examine whether it is really "equitable" to impose an equitable lien under these circumstances.

### The Equities of Insurer Reimbursement Claims Against Policyholders' Personal Injury Attorneys

We have already noted that when an insurer makes first party payments to its policyholder there is no meaningful detrimental reliance on the insurer's part. While an insurer may certainly have a contractual or even an equitable right to reimbursement or may be subrogated to its policyholder's claims, the fact is—as every claims adjuster who has ever heard the words "bad faith" full well knows—that the insurer has no choice but to make the payment (assuming, as we do of course, that the first party claims were covered in the first place). Moreover, there is no question that the attorney gains no unjust enrichment by simply turning over to his or her client what the agreement with the client *requires*: the balance of the proceeds of the litigation after legal fees and costs.

This last thought, however, requires some airing because it was not discussed in either *General Exchange* or *Aguiluz*. Courts must not forget that the attorney's duty is to his or her client—that, after all, is the nature of their relationship. When an attorney is paid proceeds which are the result of the litigation instituted on behalf of the client, the attorney's duty is to turn over those proceeds to the client. Now, the attorney may have already made an arrangement with the client to first withhold fees and costs associated with the litigation before turning over the balance, and the client may, at least in theory, direct the attorney to discharge the insurer's reimbursement claim. Still, the fact remains that, just like the insurer who has no choice but to pay the first party claim, the attorney has no choice but to turn over the balance

---

[7]See *General Exchange, supra*, 52 N.E.2d at page 972: "The defendant has practised law for about thirty years and knows the meaning and effect of subrogation."

of the proceeds to the client. Indeed, attorneys usually get into trouble if they *don't* pay over the balance to their clients.

The idea that attorneys somehow have some "duty" (as the *General Exchange* court put it) to withhold the insurer's reimbursement claim is based on a sticky gum theory of equitable liens. That is, the portion of the proceeds paid by the tortfeasor are assumed *already* to be owned by the insurer.

Not quite. One must be careful to separate out contract rights from equitable remedies. An equitable remedy, such as an equitable lien, after all, has no independent existence by itself. It is not some mystical aura that follows money around as if it were a halo on a saint in a medieval painting. Unless a court of equity actually first creates an equitable lien and then enforces it, it is the functional equivalent of a tree falling silent in a vacant forest. True, the *basis* for the lien might come into existence prior to its enforcement, but the lien itself cannot come into existence until a court of equity decides that the equities require it. In many cases of course, such as the typical lien a substituted-out attorney can assert on the proceeds of the ultimate disposition of the case, the certainty that a court of equity will impose an equitable lien give it the trappings of independent existence. But it is still a semantic trap—one which the *Aguiluz* and *General Exchange* courts fell into (and which the *Zerin* court avoided)—to assume that a lien has already come into being merely because an insurer has a contract right with its policyholder to be reimbursed for first party medical payments.

The actual equities simply do not favor creation of an equitable lien in this context. There are at least three reasons.

One, the insurer has a perfectly adequate remedy at law. The remedy is against the policyholder; there is no need for an *equitable* remedy. That remedy may not be as convenient, and the risks may be greater: What insurer, after all, would not prefer to sue a (stationary and easy to serve) plaintiff's personal injury attorney by claiming an equitable lien on litigation proceeds rather than sue its own policyholder? The real essence of these cases is simply that the insurer wants an easier target from which to recover its reimbursement claim. (Cf. *Zerin, supra*, 53 Cal.App.4th at pp. 456-457.)

Two, any supposed "duty" on the attorney to collect the insurer's reimbursement claim subjects the attorney to a most inequitable conflict between the client and an insurer in at least two situations. For one thing, the client simply may not want the attorney to pay the insurer's reimbursement claim, and may actually direct the attorney not to do so. For another, an even more

painful conflict may be created when the proceeds of the litigation are insufficient to cover both the insurer's reimbursement claim and the attorney's fee. The *General Exchange* court hinted that the attorney's claim *might* have priority over the insurer's (see *General Exchange, supra*, 52 N.E.2d at p. 973 [amount due insurer "may well be less" than full reimbursement amount because "of necessary and reasonable expenses and perhaps also attorney's fees"]), but that possibility undercuts the idea of a preexisting lien which the *Aguiluz* case seemed to assume. In any event, it is clear that the attorney's claim should have priority over the insurer's, because it is the attorney's work that results in the recovery from the tortfeasor in the first place.

Thus, the "duty" which the *General Exchange* court so casually fastened on the attorney requires the attorney to (1) decide how much his or her client properly owes the insurer for its reimbursement claim, (2) *unilaterally* enforce that claim against the client, and (assuming the court does not give the attorney's claim priority) (3) maybe even sue his or her own client for attorney fees. And the attorney isn't even paid for his or her service as a collection agent!

Three, the assumed existence of a "duty" on the attorney's part to collect the insurer's reimbursement claim ignores the problem of allocation of tort recovery between property damage, emotional distress, pain and suffering, and medical payments. Again, the supposed "equitable" lien theory results in subjecting the attorney to a conflict between his or her client—whose interest may be in allocating the recovery to *non*reimbursable items such as emotional distress—and the insurer, whose interest is in maximizing the allocation to medical expense (or property damage, as the case may be). That's equitable?

True, the equities might change if, as perhaps was the case in *General Exchange* (the opinion never tells us the nature of the subrogation agreements that the insurer "took" from the policyholder), it could be shown the insurer both disputed coverage on the first party claim, and that it specifically bargained for the right with the policyholder's attorney to have its begrudgingly given payment taken off the top from any litigation proceeds. That sort of dynamic, for example, characterized another case relied on by the *Aguiluz* court, *McCafferty* v. *Gilbank, supra*, 249 Cal.App.2d 569. There, an ex-wife specifically traded a lump-sum judgment obtained for past due child support for a percentage of litigation proceeds in a personal injury action. Thus the plaintiff's attorney in the personal injury action brought in *McCafferty* could be said to be acting on behalf of both the client's ex-wife as well as his own client when he prosecuted the tort litigation that gave rise

to the tort proceeds. In effect, the ex-wife was, if not a joint venturer in the tort litigation, certainly a silent financial partner. (See also *Miller, supra,* 216 Cal.App.2d 68, 73 [attorney represented partners of company that was joint venturer with plaintiff].) The equities thus favored imposition of an equitable lien. Similarly, it is equitable to impress proceeds of litigation with a lien favoring former attorneys whose previous work helped generate the proceeds in the first place. They *contributed* to the success of the tort litigation. (*Siciliano* v. *Fireman's Fund Ins. Co., supra,* 62 Cal.App.3d at p. 752 [lien to the extent of reasonable value of services].) The same cannot be said of an insurer who simply discharges its obligation and then seeks the easy way to collect its reimbursement claim.

## CONCLUSION

The judgment is reversed. The trial court is directed to enter judgment in favor of Smith. He is also to recover his costs on appeal.

Rylaarsdam, J., and Sonenshine, J.,* concurred.

*Retired Associate Justice of the Court of Appeal, Fourth District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.