[No. C050149. Third Dist. Dec. 28, 2005.]

PROGRESSIVE WEST INSURANCE COMPANY, Petitioner, v.
THE SUPERIOR COURT OF YOLO COUNTY, Respondent;
SIMON H. PRECIADO, Real Party in Interest.

266

**COUNSEL**

Farmer, Murphy, Smith & Alliston, Craig E. Farmer and Suzanne M. Nicholson for Petitioner.

Pillsbury Winthrop Shaw Pittman, Kevin M. Fong, Benjamin L. Webster and Michael J. Daponde for Federation of California as Amicus Curiae on behalf of Petitioner.

No appearance for Respondent.

Hayes, Davis, Ellingson, McLay & Scott, Stephen M. Hayes and Robert S. McLay for Real Party in Interest.

**OPINION**

**ROBIE, J.**—Progressive West Insurance Company filed an action against Simon H. Preciado to recover money it paid to Preciado under a first-party medical payments provision of his automobile insurance policy. In response,

Preciado filed a cross-complaint against Progressive for breach of the insurance contract, breach of the covenant of good faith and fair dealing, and unfair business practices. Generally, Preciado alleges that because Progressive may have been restricted from recovering some or all of the money from Preciado based on two common law rules, its bad faith efforts to recover the funds without engaging in any investigation give rise to Progressive's liability under the above three theories. Further, Preciado alleges Progressive made unreasonable and bad faith misrepresentations by asserting its right to recover 100 percent of the payments. Preciado further alleges that this is not an isolated instance but that Progressive has a pattern and practice of seeking 100 percent recovery from all of its policyholders regardless of its entitlement. The trial court overruled Progressive's demurrer. Petitioners filed a petition for writ of mandate and we issued an alternative writ.

As to Preciado's specific claims related to his insurance contract, we shall reverse the trial court's order overruling the demurrer as to the causes of action for breach of contract and breach of the covenant of good faith and fair dealing and direct the court to sustain the demurrer as to those causes of action without leave to amend. On Preciado's broader claims related to Progressive's handling of this issue generally, we shall affirm the court's order overruling the demurrer as to the cause of action for unfair business practices.

## FACTUAL AND PROCEDURAL BACKGROUND

Our review of the trial court's ruling on the demurrer is governed by well-settled principles. A general demurrer challenges only the legal sufficiency of a complaint, not the truth or the accuracy of its factual allegations or the plaintiff's ability to prove those allegations. (*Ball v. GTE Mobilnet of California* (2000) 81 Cal.App.4th 529, 534–535 [96 Cal.Rptr.2d 801].) " ' "We treat the demurrer as admitting all material facts properly pleaded, but not contentions, deductions or conclusions of fact or law. [Citation.] We also consider matters which may be judicially noticed." [Citation.] Further, we give the complaint a reasonable interpretation, reading it as a whole and its parts in their context. [Citation.]' " (*Zelig v. County of Los Angeles* (2002) 27 Cal.4th 1112, 1126 [119 Cal.Rptr.2d 709, 45 P.3d 1171].) Our review of the legal sufficiency of the complaint is de novo, "i.e., we exercise our independent judgment about whether the complaint states a cause of action as a matter of law. [Citation.]" (*Montclair Parkowners Assn. v. City of Montclair* (1999) 76 Cal.App.4th 784, 790 [90 Cal.Rptr.2d 598].)

Here, Progressive sued Preciado for reimbursement of Progressive's payment of medical payments to Preciado after Preciado recovered damages from the person who injured him in a car accident. In response, Preciado filed

a cross-complaint against Progressive asserting causes of action for breach of the insurance contract, tortious breach of the covenant of good faith and fair dealing, and unfair business practices.

Preciado's cross-complaint alleges as follows:

Progressive issued an automobile insurance policy to Preciado.[1] That policy provided for medical payment coverage (med-pay coverage). Med-pay coverage is first-party coverage, which pays reasonable and necessary medical expenses incurred due to an automobile accident. (See *Nager v. Allstate Ins. Co.* (2000) 83 Cal.App.4th 284, 289–290 [99 Cal.Rptr.2d 348].) "Automobile med-pay insurance provides first-party coverage on a no-fault basis for relatively low policy limits (generally ranging from $5,000 to $10,000) at relatively low premiums. [Citations.] The coverage is primarily designed to provide an additional source of funds for medical expenses for injured automobile occupants without all the burdens of a fault-based payment system." (*Ibid.*) Progressive's policy also provides that when the insurer makes a payment under the med-pay provision, it retains the right of reimbursement.

In his cross-complaint, Preciado alleges that Progressive's right of reimbursement is limited by two common law doctrines: the made-whole rule and the common-fund doctrine. Under the made-whole rule, Preciado alleges the insurer is not entitled to recover any of the payments made to its insured under the policy until the insured is made whole from the tortfeasor who caused the underlying injuries. He also alleges that Progressive failed to perform any analysis of whether he had been made whole. If it had engaged in that analysis, it would have discovered that he had not been made whole and thus Progressive was not entitled to recover any reimbursement from him.

Under the common-fund doctrine, Preciado alleges an insurance company that does not participate in the litigation to recover damages from the third party who caused its insured's injuries must pay a pro rata share of the attorney fees incurred by the insured to recover those funds when it seeks reimbursement. Thus, the insurance company's reimbursement must be reduced by the amount of attorney fees attributable to the recovery of the funds subject to the insurance company's right of reimbursement.

---

[1] "To state a cause of action for breach of contract, it is absolutely essential to plead the terms of the contract either in haec verba or according to legal effect." (*Twaite v. Allstate Ins. Co.* (1989) 216 Cal.App.3d 239, 252 [264 Cal.Rptr. 598].) Nowhere in his pleading does Preciado allege the terms of the insurance policy which he contends has been breached. Because the policy is attached to Progressive's original complaint and Progressive sought judicial notice of that complaint as part of Progressive's demurrer, the provisions of the insurance contract are properly before us.

Preciado alleges he retained an attorney to recover funds and therefore Progressive "must acknowledge the common fund doctrine and deduct from the amount claimed a pro-rata reduction of attorney's fees and costs." "[C]ontrary to California law, PROGRESSIVE is seeking the full amount paid to PRECIADO under the relevant med-pay provision. . . . [T]his attempt to recoup all monies paid is a blatant attempt to seize funds to which Progressive is not lawfully entitled, and amounts to fraud." Preciado pled in his first cause of action that Progressive's conduct regarding the made-whole rule and the common-fund doctrine breached the insurance contract.

He further pled Progressive breached the covenant of good faith and fair dealing "by engaging in the conduct alleged hereinabove including, without limitation, the following: a) unreasonably and in bad faith failing to investigate PRECIADO's claim properly; b) unreasonably and in bad faith failing and refusing to acknowledge the controlling law as it relates to insurance reimbursement in general, and med-pay reimbursement in particular; c) unreasonably and in bad [faith] failing and refusing to provide adequate, and informed communication as between an insurer and an insured/med-pay recipient; d) unreasonably and in bad faith failing and refusing to promptly and adequately explain the policy coverages; e) unreasonably and in bad faith misleading PRECIADO regarding his true obligations owed, if any to PRO-GRESSIVE; f) unreasonably and in bad faith misrepresenting to PRECIADO material facts concerning his claims and the valid and proper amount of benefits due under the Policy; g) unreasonably and in bad faith attempting to collect, through intimidation and coercion, amounts to which PROGRES-SIVE is not entitled; and h) unreasonably and in bad faith failing and refusing to provide timely and full and complete benefits to PRECIADO." Based on this conduct, Preciado alleges he "has suffered, and will continue to suffer in the future, economic and consequential damages" in an amount according to proof. Preciado also seeks punitive damages on his claim for breach of the covenant of good faith and fair dealing.

Finally, in an unfair business practice cause of action, Preciado alleges that Progressive's conduct violates Business and Professions Code[2] section 17200 as an unlawful, unfair or fraudulent business practice. The cross-complaint alleges Progressive has a "pattern and practice of seeking med-pay reimbursement even though it never engaged in any discussion, analysis or conclusion that the injured party has in fact been made whole" and "continues to seek[] sums it is not entitled to as a matter of law to further its unlawful scheme." Further, Preciado alleges that Progressive has a "pattern and practice of ignoring California law by seeking 100% reimbursement for the amounts paid under its med-pay provision. This systematic scheme is contrary to law, and

---

[2] All further statutory references are to the Business and Professions Code unless otherwise indicated.

is nothing more than a sharp, illicit business practice." Based on these key allegations, Preciado alleges Progressive fails to investigate claims, fails to properly explain policy benefits, misled Preciado and misrepresented material facts pertaining to his claim, imposes unacceptably high reimbursement amounts, and forced Preciado to retain attorneys and incur economic damages to receive proper benefits under the policy.

Progressive filed a general demurrer to the cross-complaint. The trial court overruled Progressive's demurrer to these three causes of action. Progressive filed a petition for writ of mandate. We issued an alternative writ.

## DISCUSSION

### I

### *The Made-whole Rule and the Common-fund Doctrine*

### A

### *Made-whole Rule*

■ When an insurance company pays out a claim on a first-party insurance policy to its insured, the insurance company is subrogated to the rights of its insured against any tortfeasor who is liable to the insured for the insured's damages. (See, e.g., *Plut v. Fireman's Fund Ins. Co.* (2000) 85 Cal.App.4th 98, 104 [102 Cal.Rptr.2d 36] [" 'Subrogation is the insurer's right to be put in the position of the insured, in order to recover from third parties who are legally responsible to the insured for a loss paid by the insurer. [Citation.]' [Citation.]"]; *Hodge v. Kirkpatrick Dev., Inc.* (2005) 130 Cal.App.4th 540, 548 [30 Cal.Rptr.3d 303].) Subrogation has its source in equity and arises by operation of law (legal or equitable subrogation). (*Sapiano v. Williamsburg Nat. Ins. Co.* (1994) 28 Cal.App.4th 533, 537, fn. 1 [33 Cal.Rptr.2d 659].) It can also arise out of the contractual language of the insurance policy (conventional subrogation). (*Ibid.*) The subrogation provisions of most insurance contracts typically are general and add nothing to the rights of subrogation that arise as a matter of law. (*Id.* at p. 538.)

■ Subrogation places the insurer in the shoes of its insured to the extent of its payment. (*Hodge v. Kirkpatrick Dev., Inc., supra,* 130 Cal.App.4th at p. 548.) In personal injury actions, however, the insurance company may not assert its subrogation claim directly against the third party tortfeasor on its own behalf. (*Fifield Manor v. Finston* (1960) 54 Cal.2d 632, 639–640, 643 [7 Cal.Rptr. 377, 354 P.2d 1073].) Moreover, the insurance company may not

seek to "gang-press" a policyholder's personal injury attorney into service as a collection agent by suing the attorney to pay it any judgment or settlement proceeds from the third party that passes through that attorney's hands. (*Farmers Ins. Exchange v. Smith* (1999) 71 Cal.App.4th 660, 662 [83 Cal.Rptr.2d 911].) Thus, to preserve its right of subrogation, the insurance company must either interplead itself into any action brought by the insured against the third party tortfeasor, or wait to seek reimbursement under the language of its policy from its insured to the extent that the insured recovers money from the third party. (*Plut v. Fireman's Fund Ins. Co., supra,* 85 Cal.App.4th at p. 104; *Hodge v. Kirkpatrick Dev., Inc., supra,* 130 Cal.App.4th at p. 548.)

■ Where the insurance company does not interplead itself into the underlying action, the insurance company's rights to recover any payments received by its insured are limited. Under the made-whole rule, "[w]hen an insurer does not participate in the insured's action against a tortfeasor, despite knowledge of that action, the insurer cannot recover any funds obtained through settlement of the action unless the full amount received exceeds the insured's actual loss. [Citation.] Furthermore, the insured need not account to the nonparticipating insurer 'for more than the surplus remaining in his hands, after satisfying his loss in full and his reasonable expenses incurred in the recovery.' [Citation.] Thus, when an insurer elects not to participate in the insured's action against a tortfeasor, the insurer is entitled to subrogation only after the insured has recouped his loss *and* some or all of his litigation expenses incurred in the action against the tortfeasor." (*Plut v. Fireman's Fund Ins. Co., supra,* 85 Cal.App.4th at pp. 104–105; see also *Hodge v. Kirkpatrick Dev., Inc., supra,* 130 Cal.App.4th at pp. 552–553.)

■ Progressive argues the made-whole rule does not apply here because it is seeking "reimbursement" from its insured, not "subrogation" from the party who injured Preciado. As explained by a leading commentator on insurance law, there is a technical difference between subrogation and reimbursement. (16 Couch, Insurance (3d ed. 2000) § 222:2, pp. 222-10 through 222-14.) Subrogation refers to the right of the insurance company to step into the shoes of the insured and assert the insured's rights against the third party. (*Id.* at p. 222-11.) Reimbursement refers to the right to receive payment back of what has been expended by the insurance company. (*Ibid.*) That same commentator, however, acknowledges that those terms are often used interchangeably in the cases. (*Ibid.*) In California, both the subrogation rights and reimbursement rights of the insurance company fall within the rubric of subrogation. (See *Plut v. Fireman's Fund Ins. Co., supra,* 85 Cal.App.4th at pp. 104–105; *Textron Financial Corp. v. National Union Fire Ins. Co.* (2004) 118 Cal.App.4th 1061, 1077 [13 Cal.Rptr.3d 586]; *Hodge v. Kirkpatrick Development, Inc., supra,* 130 Cal.App.4th at p. 553.) Thus, both of those rights are limited by the made-whole rule.

Progressive further argues the language of the policy abrogates the made-whole rule because it states that in the event of payment under the policy, Progressive "is entitled to all the rights of recovery that the insured person to whom payment was made has against another." We reject this claim.

" 'It is a general equitable principle of insurance law that, *absent an agreement to the contrary*, an insurance company may not enforce a right to subrogation until the insured has been fully compensated for [his or] her injuries, that is, has been made whole. [Citations.]' [Citations.]" (*Plut v. Fireman's Fund Ins. Co., supra*, 85 Cal.App.4th at p. 104, italics added.) There is authority that language in an insurance policy that grants the insurance company "all rights of recovery to the extent of its payment" overrides the common law made-whole rule. (See, e.g., *Barnes v. Independent Auto. Dealers of California* (9th Cir. 1995) 64 F.3d 1389, 1393, 1396.) Indeed, in *Travelers Indem. Co. v. Ingebretsen* (1974) 38 Cal.App.3d 858, 865 [113 Cal.Rptr. 679], the parties executed a specific subrogation agreement which provided: " 'In consideration of and to the extent of said payment the undersigned *hereby assigns and transfers* to the said Company *all rights, claims, demands and interest which the undersigned may have against any party through the occurrence of such loss* and authorizes said Company to sue, compromise or settle in the name of the undersigned or otherwise all such claims and to execute and sign releases and acquittances in the name of the undersigned.' " The appellate court concluded the insured's assignment to the insurance company of "all rights" "to the extent of payment" gave the insurance company priority to any recovery obtained by the insured. (*Id.* at pp. 865–866.)

The more recent cases, however, require that the contractual provision that intends to vitiate this rule must "clearly and specifically [give] the insurer a priority out of proceeds from the tortfeasor regardless whether the insured was first made whole." (*Sapiano v. Williamsburg Nat. Ins. Co., supra*, 28 Cal.App.4th at pp. 538–539.) Thus, in *Sapiano*, the relevant provision of the insurance policy stated, "[i]f any person or organization to or for whom we make payment under this Coverage Form has rights to recover damages from another, those rights are transferred to us." (*Id.* at pp. 535–536.) That provision was not sufficient to overcome the made-whole rule. (*Id.* at pp. 538–539.) The *Sapiano* court concluded the language of the insurance contract at issue in *Samura v. Kaiser Foundation Health Plan, Inc.* (1993) 17 Cal.App.4th 1284, 1289–1290 [22 Cal.Rptr.2d 20], however, provided a good example of the language necessary to abrogate the made-whole rule. (*Sapiano v. Williamsburg Nat. Ins. Co., supra*, 28 Cal.App.4th at p. 538.) The language in the Kaiser agreement provided, " 'Health Plan (or its designee) shall be entitled to the payment, reimbursement, and subrogation as provided in this Section C(1) regardless of whether the total amount of the recovery of the Member (or his or her estate, parent or legal guardian) on account of the

injury or illness is less than the actual loss suffered by the Member (or his or her estate, parent or legal guardian).' " (*Samura v. Kaiser Foundation Health Plan, Inc., supra,* 17 Cal.App.4th at pp. 1289–1290.)

Here, the policy states Progressive "is entitled to all the rights of recovery that the insured person to whom payment was made has against another." In a separate paragraph of the policy, the policy states, "When an insured person has been paid by us under this policy and also recovers from another person, entity, or organization, the amount recovered will be held by the insured person in trust for [Progressive] and reimbursed to [Progressive] to the extent of our payment." These two provisions, individually or taken together do not clearly indicate that Progressive's rights are first in priority. In addition, these two provisions do not explain that Progressive may seek reimbursement regardless of whether the insured was made whole by his recovery from the third party. Furthermore, unlike the provision in *Travelers Indem. Co. v. Ingebretsen, supra,* 38 Cal.App.3d 858, 865, these provisions do not assign or transfer all rights to the insurer to the extent of the insurance company's payment. Thus, we conclude the made-whole rule is not vitiated by this policy language.

## B

### Common-fund Doctrine

Progressive does not argue the common-fund doctrine does not apply here and thus, we provide a brief summary of that rule here. The common-fund doctrine is a second limitation on an insurance company's ability to recover funds from its insured where the insured obtains a judgment or settlement from the third party tortfeasor. Under the common-fund rule, " '[W]hen a number of persons are entitled in common to a specific fund, and an action brought by a plaintiff or plaintiffs for the benefit of all results in the creation or preservation of that fund, such plaintiff or plaintiffs may be awarded attorney's fees out of the fund.' " (*Lee v. State Farm Mut. Auto. Ins. Co.* (1976) 57 Cal.App.3d 458, 467 [129 Cal.Rptr. 271].) " 'The bases of the equitable rule which permits surcharging a common fund with the expenses of its protection or recovery, including counsel fees, appear to be these: fairness to the successful litigant, who might otherwise receive no benefit because his recovery might be consumed by the expenses; correlative prevention of an unfair advantage to the others who are entitled to share in the fund and who should bear their share of the burden of its recovery; encouragement of the attorney for the successful litigant, who will be more willing to undertake and diligently prosecute proper litigation for the protection or recovery of the fund if he is assured that he will be promptly and directly compensated should his efforts be successful.' " (*Id.* at pp. 467–468.) Under

this rule, an insurance company that does not participate in the underlying action must pay a pro rata share of the insured's attorney fees and costs when it seeks reimbursement from its insured out of funds obtained by the insured from the responsible third party. (*Id.* at p. 469.) That is, the insurance company's reimbursement must be reduced proportionately to reflect the attorney fees paid by the insured. (*Hartford Accident & Indemnity Co. v. Gropman* (1984) 163 Cal.App.3d Supp. 33, 39–40 [209 Cal.Rptr. 468].)

## II

### *Preciado Has Not Stated a Cause of Action for Breach of the Covenant of Good Faith and Fair Dealing*

Progressive argues that Preciado failed to state a cause of action for breach of the implied covenant of good faith and fair dealing because he has not alleged and cannot allege that benefits are due under the policy. We agree.

In his cross-complaint, Preciado alleges Progressive breached the covenant of good faith and fair dealing by: "a) unreasonably and in bad faith failing to investigate PRECIADO's claim properly; b) unreasonably and in bad faith failing and refusing to acknowledge the controlling law as it relates to insurance reimbursement in general, and med-pay reimbursement in particular; c) unreasonably and in bad [faith] failing and refusing to provide adequate, and informed communication as between an insurer and an insured/med-pay recipient; d) unreasonably and in bad faith failing and refusing to promptly and adequately explain the policy coverages; e) unreasonably and in bad faith misleading PRECIADO regarding his true obligations owed, if any to PROGRESSIVE; f) unreasonably and in bad faith misrepresenting to PRECIADO material facts concerning his claims and the valid and proper amount of benefits due under the Policy; g) unreasonably and in bad faith attempting to collect, through intimidation and coercion, amounts to which PROGRESSIVE is not entitled; and h) unreasonably and in bad faith failing and refusing to provide timely and full and complete benefits to PRECIADO." Each of these allegations must be read in the context of the general allegations plead in the complaint which detail that each of these claimed breaches arises out of Progressive's demand for more money in reimbursement than it was entitled under the common-fund doctrine and/or the made-whole rule. When read in that context, this pleading fails to state a cause of action.

"Every contract imposes on each party an implied duty of good faith and fair dealing. [Citation.] Simply stated, the burden imposed is ' "that neither party will do anything which will injure the right of the other to receive the benefits of the agreement.' " [Citations.] Or, to put it another way,

the 'implied covenant imposes upon each party the obligation to do everything that the contract presupposes they will do to accomplish its purpose.' [Citations.] A ' "breach of the implied covenant of good faith and fair dealing involves something beyond breach of the contractual duty itself," and it has been held that " '[b]ad faith implies unfair dealing rather than mistaken judgment. . . .' [Citation.]" [Citation.]' [Citation.] For example, in the context of the insurance contract, it has been held that the insurer's responsibility to act fairly and in good faith with respect to the handling of the insured's claim ' "is not the requirement mandated by the terms of the policy itself—to defend, settle, or pay. It is the obligation . . . under which the insurer must act fairly and in good faith in discharging its contractual responsibilities." [Citation.]' [Citations.]" (*Chateau Chamberay Homeowners Assn. v. Associated Internat. Ins. Co.* (2001) 90 Cal.App.4th 335, 345–346 [108 Cal.Rptr.2d 776].)

■ "Insurance contracts are unique in nature and purpose. [Citation.] An insured does not enter an insurance contract seeking profit, but instead seeks security and peace of mind through protection against calamity. [Citation.] The bargained-for peace of mind comes from the assurance that the insured will receive prompt payment of money in times of need. [Citation.] Because peace of mind and security are the principal benefits for the insured, the courts have imposed special obligations, consonant with these special purposes, *seeking to encourage insurers promptly to process and pay claims.* Thus, an insurer must investigate claims thoroughly [citation]; it may not deny coverage based on either unduly restrictive policy interpretations [citation] or standards known to be improper [citation]; it may not unreasonably delay in processing or paying claims [citation]." (*Love v. Fire Ins. Exchange* (1990) 221 Cal.App.3d 1136, 1148 [271 Cal.Rptr. 246] (*Love*), italics added.) "These special duties, at least to the extent breaches thereof give rise to tort liability, find no counterpart in the obligations owed by parties to ordinary commercial contracts. The rationale for the difference in obligations is apparent. If an insurer were free of such special duties and could deny or delay payment of clearly owed debts with impunity, the insured would be deprived of the precise benefit the contract was designed to secure (i.e., peace of mind) and would suffer the precise harm (i.e., lack of funds in times of crisis) the contract was designed to prevent. [Citation.] To avoid or discourage conduct which would thus frustrate realization of the contract's principal benefit (i.e., peace of mind), special and heightened implied duties of good faith are imposed on insurers and made enforceable in tort. While these 'special' duties are akin to, and often resemble, duties which are also owed by fiduciaries, the fiduciary-like duties arise because of the unique nature of the insurance contract, *not* because an insurer is a fiduciary." (*Ibid.*)

In *Love,* the insureds sought to estop the insurance company from asserting the statute of limitations because the insurance company had an obligation to

disclose that an excluded loss was a covered loss under certain circumstances. (*Love, supra,* 221 Cal.App.3d at p. 1144.) The insureds claimed this duty arose out of the fact that the insurance company owed the insureds a fiduciary duty to disclose this legal argument that would provide them with coverage. (*Ibid.*) In rejecting this argument, the *Love* court stated, "we are unaware of any authority holding that an insurer is estopped to plead the statute of limitations merely because when it denied a claim it failed to inform its insured of pertinent laws or legal theories upon which the insured could rely in a later lawsuit challenging denial of the claim." (*Ibid.*) The court noted, "because of the 'special relationship' inherent in the unique nature of an insurance contract, the insurer's obligations attendant to its duty of good faith are heightened. Such obligations have been characterized as *akin* to fiduciary-type responsibilities. [Citation.] Because of this unique 'special relationship,' a breach of the obligation of good faith may give rise to tort (rather than mere contractual) remedies. [Citation.]" (*Id.* at p. 1147.) The court continued, "However, the California Supreme Court has never squarely held that an insurer is a *true* fiduciary to its insured." (*Ibid.*) The court pointed out that "[u]nique obligations are imposed upon true fiduciaries which are not found in the insurance relationship. For example, a true fiduciary must first consider and always act in the best interests of its trust and not allow self-interest to overpower its duty to act in the trust's best interests. [Citation.] An insurer, however, may give its own interests consideration equal to that it gives the interests of its insured [citation]; it is not required to disregard the interests of its shareholders and other policyholders when evaluating claims [citation]; and it is not required to pay noncovered claims, even though payment would be in the best interests of its insured [citation]." (*Id.* at pp. 1148–1149.) Thus, the court concluded the relationship between the insured and the insurance company did not give rise to an affirmative obligation for the insurer to "advise an insured of different legal theories or statutory provisions which an insured could use to avoid policy exclusions." (*Id.* at p. 1150.)

The *Love* court explained, "there are at least two separate requirements to establish breach of the implied covenant: (1) benefits due under the policy must have been withheld; and (2) the reason for withholding benefits must have been unreasonable or without proper cause." (*Love, supra,* 221 Cal.App.3d at p. 1151.) As a result, where no benefits are withheld or delayed, there is no cause of action for the breach of the covenant of good faith and fair dealing. (*Id.* at p. 1152.)

In *Jonathan Neil & Assoc., Inc. v. Jones* (2004) 33 Cal.4th 917, 923 [16 Cal.Rptr.3d 849, 94 P.3d 1055], the insureds defended a collection action against them by their insurance company and filed a cross-complaint against the company for breach of the covenant of good faith and fair dealing when the insurance company "retroactively and knowingly charged [them] a substantially higher premium than was actually owed." Our Supreme Court

declined to extend the tort remedies for the breach of the covenant to the insurance company's conduct in this instance. (*Id.* at p. 941.) Three factors counseled against the extension of tort liability to this postclaim practice. (*Id.* at p. 939.) First, the billing dispute, by itself, did not "deny the insured the benefits of the insurance policy the security against losses and third party liability." (*Ibid.*) Second, the "dispute [did] not require the insured to prosecute the insurer in order to enforce its rights, as in the case of bad faith claims and settlement practices." (*Ibid.*) And, third, "traditional tort remedies may be available to the insured who is wrongfully billed a retroactive premium," such as a malicious prosecution action, or a defamation action, or · intentional interference with contract action. (*Ibid.*)

■ Here, these rules dictate that Preciado has not stated a cause of action against Progressive for the breach of the covenant of good faith and fair dealing. By pleading that Progressive is seeking *reimbursement* under the policy, Preciado acknowledges Progressive paid him what was due under that policy. No factual allegation in the cross-complaint suggests that Progressive unduly delayed in paying these benefits, or that it failed to properly investigate the claim in a manner that delayed the payment of those benefits to the detriment of its insured. Because the essence of the tort of the implied covenant of good faith and fair dealing is focused on the prompt payment of benefits due under the insurance policy, there is no cause of action for breach of the covenant of good faith and fair dealing when no benefits are due.

Moreover, each of the three factors enumerated in *Jonathan Neil & Assoc., Inc. v. Jones, supra,* 33 Cal.4th at page 939, supports the conclusion that the bad faith assertion of Progressive that it was entitled to the return of all of the money it paid to Preciado did not violate the covenant of good faith and fair dealing. First, as we have noted, Progressive did not deny Preciado the benefits of the insurance policy. Rather, it promptly paid those funds to Preciado. Second, the instant dispute did not require Preciado to sue the insurer to enforce its rights, as is the case of bad faith claims and settlement practices. Third, Preciado retains the traditional tort remedy of malicious prosecution in the event that Progressive's conduct was indeed malicious.

Preciado offers the rejoinder that Progressive withheld "policy benefits" when it "sought to take back benefits from Preciado that were lawfully his." We reject Preciado's characterization. Progressive's demand for return of the benefits it paid to Preciado, even to the extent that demand in bad faith exceeded the amount to which Progressive was entitled, does not constitute a withholding of the benefits at the critical time. Nor does it go to the heart of the policy reason behind the covenant of good faith and fair dealing—that is the prompt payment of benefits to the insured. Rather, this case is no different than any other garden variety contractual dispute between two parties to a contract. The covenant of good faith and fair dealing does not extend this far.

Preciado also argues that the insurer can violate the covenant of good faith and fair dealing even when it has paid out all of the benefits under the policy. He cites *Schwartz v. State Farm Fire & Casualty Co.* (2001) 88 Cal.App.4th 1329 [106 Cal.Rptr.2d 523]; *Neal v. Farmers Ins. Exchange* (1978) 21 Cal.3d 910 [148 Cal.Rptr. 389, 582 P.2d 980]; *Johansen v. California State Auto. Assn. Inter-Ins. Bureau* (1975) 15 Cal.3d 9 [123 Cal.Rptr. 288, 538 P.2d 744]. None of these cases is instructive here.

In *Schwartz,* the insurer paid out the full benefits of the policy in a manner that favored one insured to the detriment of a second insured for the same benefits. (*Schwartz v. State Farm Fire & Casualty Co., supra,* 88 Cal.App.4th at pp. 1333–1334.) The court concluded that "even an insurer that pays the full limits of its policy may be liable for breach of the implied covenant, if improper claims handling causes detriment to the insured." (*Id.* at p. 1339.) Here, this dispute about whether Progressive is entitled to less than all of the money it paid to Preciado cannot be properly characterized as "improper claims handling [that] cause[d] detriment to" Preciado.

In *Johansen,* the court concluded that the insurer breached the covenant of good faith and fair dealing when it refused to promptly accept a reasonable settlement offer that was within the policy limits. (*Johansen v. California State Auto. Assn. Inter-Ins. Bureau, supra,* 15 Cal.3d at p. 19.) In *Neal v. Farmers Ins. Exchange,* the insurance company refused to accept offers of settlement, and subsequently submitted the matter to its attorney for an opinion, all as a part of a conscious course of conduct designed to force a settlement more favorable to the company than the facts would have otherwise warranted. (*Neal v. Farmers Ins. Exchange, supra,* 21 Cal.3d at pp. 922–923.) These facts do not come close to those at bar and offer no helpful analogy.

Lastly, in *Brizuela v. CalFarm Ins. Co.* (2004) 116 Cal.App.4th 578, 592 [10 Cal.Rptr.3d 661], the court stated, "The gravamen of a claim for breach of the covenant of good faith and fair dealing, which sounds in both contract and tort, is the insurer's refusal, without proper cause, to compensate the insured for a loss covered by the policy." In rejecting the insured's claim of breach of this covenant, the court stated, "Some authorities have suggested hypothetical circumstances in which an insurance company might be liable for bad faith despite the insured's lack of a contract right to benefits under the insurance policy. (Ashley, Bad Faith Actions Liability and Damages (2d ed. 1997), § 5A:02, p. 5A-10 [insurer might be liable for bad faith if, instead of investigating a non-covered claim, insurer embarked on campaign to intimidate insured into settling]; see, e.g., *Murray v. State Farm Fire & Casualty Co.* (1990) 219 Cal.App.3d 58, 65–66 [268 Cal.Rptr. 33] [insurance company might be liable if it unreasonably delayed investigating an [*sic*] noncovered claim].)" (*Id.* at p. 594.)

Here, there are no allegations in the pleadings that Progressive did anything other than pay out the benefits to Preciado in a timely fashion.

We will therefore issue a writ of mandate directing the trial court to sustain the demurrer without leave to amend as to the cause of action for breach of the covenant of good faith and fair dealing.

III

*Preciado Has Not Stated a Cause of Action for Breach of Contract*

Progressive argues that Preciado has not alleged a breach of contract against it. We agree.

The allegations of the complaint are that Progressive breached the contract by "failing to engage in any analysis or discussion as to whether PRECIADO was Made Whole prior to instituting its improper collection efforts; [and] fraudulently seeking full reimbursement of its expended funds even though, as a matter of law, PROGRESSIVE must reduce the amount claimed pursuant to the Common Fund Theory."

Preciado pleads no provision of the contract which places the burden on Progressive of engaging in analysis or discussion of whether Preciado was made whole, or determining if the common-fund doctrine applies. It is true the made-whole rule and the common-fund doctrine are incorporated into the contract as the common law of the State of California. Nothing in the cases that discuss those doctrines, however, places the burden on the insurance company to investigate or determine all of the facts required to ascertain the extent to which these rules might constitute a defense to the insurance company's right of reimbursement.

The provisions of an insurance policy must be read in conjunction with the existing law. "The interpretation of the language in an insurance policy is a question of law. In resolving such a question courts look first to the plain meaning of the disputed term to ascertain the mutual intention of the parties. [Citation.] As a general rule of construction, the parties are presumed to know and to have had in mind all applicable laws extant when an agreement is made. These existing laws are considered part of the contract just as if they were expressly referred to and incorporated." (*Miracle Auto Center v. Superior Court* (1998) 68 Cal.App.4th 818, 821 [80 Cal.Rptr.2d 587].) Existing law includes the common law of the state. (*In re Retirement Cases* (2003) 110 Cal.App.4th 426, 447 [1 Cal.Rptr.3d 790].) Thus, the

made-whole rule and the common-fund doctrine must be considered part of the insurance contract between Progressive and Preciado.[3]

 Simply because these doctrines are part of the contract and may potentially restrict the amount of Progressive's reimbursement does not render the allegations of the complaint actionable. The made-whole rule and the common-fund doctrine are both doctrines of equity that limit what the insurance company is entitled to receive in reimbursement from its insured. (*Plut v. Fireman's Fund Ins. Co., supra,* 85 Cal.App.4th at pp. 103–104 [made-whole rule gives rise to an equitable offset]; *Lee v. State Farm Mut. Auto. Ins. Co., supra,* 57 Cal.App.3d at p. 467 [common-fund doctrine is prime example of the court exercising its inherent power to create exceptions to the basic rule on attorney fees].) There is nothing in any of the cases discussing the made-whole rule or the common-fund doctrine (pt. I, *ante*) that requires the insurance company to conduct an investigation before demanding repayment.

It is a far cry from the limitations on the amount the insurance company may recover from its insured to the conclusion that the insurer must investigate, determine, and advise its insured (who is represented by counsel) about the applicability of these two equitable common law doctrines before it seeks return of the money. Preciado cites no authority for the proposition that this duty falls on the insurance company's shoulders. Indeed, the language of *Love, supra,* 211 Cal.App.3d at page 1150, that no case imposes a duty on the "insurer to advise an insured of the different legal theories or statutory provisions which an insured could use to avoid policy exclusions" supports a contrary conclusion. Moreover, the insurance company is entitled to consider its own interests especially in the context of conduct it engages in after it timely pays out benefits. (*Love, supra,* 221 Cal.App.3d at pp. 1148–1149.) There is nothing in the insurance contract that requires this result either.

Logic dictates that this burden should remain firmly on the back of the insured, who has all of the information required to determine whether either of these doctrines provides a defense to the insured. Here, Preciado knows that he has an attorney and what he paid that person. Further, he has the information as to what his total damages were, and whether he was made whole by the settlement with the third party tortfeasor.

Thus, we detect no actionable breach of contract in the allegations of the complaint. As a result, we shall issue a writ of mandate directing the trial court to sustain the demurrer without leave to amend.

---

[3] As we have already noted, the made-whole rule can be contractually vitiated by clear language demonstrating the insurance company's priority and entitlement to the proceeds. (*Sapiano v. Williamsburg Nat. Ins. Co., supra,*28 Cal.App.4th at pp. 538–539.) That contractual limitation is not contained in this policy.

IV

*Preciado Has Stated a Cause of Action for Unfair or
Fraudulent Business Practices*

Progressive argues the trial court erred when it concluded Preciado stated a cause of action for unfair business practices. It is here we part company with Progressive.

In his cross complaint, Preciado alleges Progressive has a "pattern and practice of seeking med-pay reimbursement even though it never engaged in any discussion, analysis or conclusion that the injured party has in fact been made whole" and "continues to seek[] sums it is not entitled to as a matter of law to further its unlawful scheme." Further, Preciado alleges that Progressive has a "pattern and practice of ignoring California Law by seeking 100% reimbursement for the amounts paid under its med-pay provision. This systematic scheme is contrary to law, and is nothing more than a sharp, illicit business practice." Based on these key allegations, Preciado alleges Progressive fails to investigate claims, fails to properly explain policy benefits, misled Preciado and misrepresented material facts pertaining to his claim, imposes unacceptably high reimbursement amounts, and forced Preciado to retain an attorney and incur economic damages in order to receive proper benefits under the policy.

These practices, to the extent they are more general than the allegations of the breach of contract and breach of the covenant of good faith and fair dealing causes of action, state a cause of action. It may be that Preciado may not be able to adduce evidence as to this "pattern and practice" of activities. At this stage of the proceedings, however, we must affirm the overruling of Progressive's demurrer as to this cause of action.

Section 17200 provides: "[a]s used in this chapter, unfair competition shall mean and include any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising and any act prohibited by Chapter 1 (commencing with Section 17500) of Part 3 of Division 7 of the Business and Professions Code." This statute "establishes three separate types of unfair competition. The statute prohibits practices that are either 'unfair,' or 'unlawful,' or 'fraudulent.' [Citation.]" (*Pastoria v. Nationwide Ins.* (2003) 112 Cal.App.4th 1490, 1496 [6 Cal.Rptr.3d 148].)

" 'Section 17200 "is not confined to anticompetitive business practices, but is also directed toward the public's right to protection from fraud, deceit, and unlawful conduct. [Citation.]" ' " *Community Assisting Recovery, Inc. v. Aegis Security Ins. Co.* (2001) 92 Cal.App.4th 886, 891 [112

Cal.Rptr.2d 304].) Thus, "unfair competition statutes have always been framed in 'broad, sweeping language, precisely to enable judicial tribunals to deal with the innumerable " 'new schemes which the fertility of man's invention would contrive.' " [Citation.]' [Citation.]" (*Id.* at p. 894.)

A

*Fraudulent Business Practices*

■ A fraudulent business practice under section 17200 "is not based upon proof of the common law tort of deceit or deception, but is instead premised on whether the public is likely to be deceived." (*Pastoria v. Nationwide Ins., supra,* 112 Cal.App.4th at p. 1498.) Stated another way, "In order to state a cause of action under the fraud prong of [section 17200] a plaintiff need not show that he or others were actually deceived or confused by the conduct or business practice in question. The "fraud" prong of [section 17200] is unlike common law fraud or deception. A violation can be shown even if no one was actually deceived, relied upon the fraudulent practice, or sustained any damage. Instead, it is only necessary to show that members of the public are likely to be deceived.' [Citations.]" (*Schnall v. Hertz Corp.* (2000) 78 Cal.App.4th 1144, 1167–1168 [93 Cal.Rptr.2d 439].)

Thus, the court concluded the plaintiffs in *Pastoria v. Nationwide Ins., supra,* 112 Cal.App.4th at pages 1496–1497, stated a claim for a fraudulent business practice that was likely to confuse consumers when they alleged the insurance company knew that it had decided to make material changes to its insurance policies, but refused to tell policyholders of those imminent changes until after it sold the policies to the customers.

In *People v. McKale* (1979) 25 Cal.3d 626, 630–631 [159 Cal.Rptr. 811, 602 P.2d 731], the state sued the owners of a mobilehome park for unfair business practices. One of the alleged offending business practices was that the owners required the tenants to sign a copy of the park's rules and regulations that contained provisions that the owners were barred from enforcing as a matter of law. (*Id.* at p. 635.) The Supreme Court had no trouble concluding that these allegations were sufficient to state an actionable fraudulent business practice. (*Ibid.*) The owners' assertion of contract rights the owners did not have was likely to deceive the tenants who were forced to sign those documents. (*Ibid.*)

Here, Preciado alleges that Progressive engages in the pattern and practice of asserting its rights to 100 percent recovery of all moneys it pays to its insureds regardless of whether that reimbursement should be denied altogether or partially due to the made-whole rule and the common-fund doctrine.

Further, Preciado alleges that Progressive made material misrepresentations and misled him (and presumably each of its customers it makes these same demands upon as a matter of course) in this regard.[4] This conduct is likely to deceive the public. For purposes of this pleading, we conclude that Preciado has stated a cause of action and the demurrer was properly overruled.[5]

## B

### *Unfair Business Practice*

The state of the law on what constitutes an unfair business practice in consumer cases is somewhat unsettled in light of *Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co.* (1999) 20 Cal.4th 163 [83 Cal.Rptr.2d 548, 973 P.2d 527].

Prior to *Cel-Tech*, whether a practice was "unfair" under section 17200 required the court to engage in a balancing test. (See, e.g., *Klein v. Earth Elements, Inc.* (1997) 59 Cal.App.4th 965, 969 [69 Cal.Rptr.2d 623].) "Determination of whether a business practice or act is 'unfair' within the meaning of the UCA entails examination of the impact of the practice or act on its victim, ' ". . . balanced against the reasons, justifications and motives of the alleged wrongdoer. In brief, the court must weigh the utility of the defendant's conduct against the gravity of the harm to the alleged victim . . . ." [Citation.]' [Citation.]" (*Id.* at pp. 969–970.)

In *Cel-Tech*, our Supreme Court concluded that in the context of a dispute between business competitors, this balancing test was "too amorphous and provide[d] too little guidance to courts and businesses." (*Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co., supra,* 20 Cal.4th at pp. 185, 187, fn. 12.) Thus, the court adopted the following test, "[w]hen a plaintiff who claims to have suffered injury from a direct competitor's 'unfair' act or practice invokes section 17200, the word 'unfair' in that section means conduct that threatens an incipient violation of an antitrust law, or violates the policy or spirit of one of those laws because its effects are

---

[4] While not properly before us on the ruling on this demurrer, in his briefing, Preciado submitted a copy of the letter that Progressive sent to him. It shows the caption "FINAL NOTICE," and states that $5,000 is due. In a followup letter, Progressive asserts that *Lee v. State Farm Mut. Auto. Ins. Co., supra,* 57 Cal.App.3d 458, authorizes its reimbursement request, but omits anything about that case's application of the common-fund doctrine to that recovery. This letter appears likely to deceive the public to the extent that Progressive distributes it without regard to its knowledge of its insured's rights to these offsets.

[5] We express no opinion as to whether Preciado's attorney fees constitute "injury in fact" as required under section 17204. Preciado has alleged that the conduct has forced him to incur "economic damages" in addition to attorney fees.

comparable to or the same as a violation of the law, or otherwise significantly threatens or harms competition." (*Id.* at p. 187.) At the same time, the court declared, "This case involves an action by a competitor alleging anticompetitive practices. Our discussion and this test are limited to that context. Nothing we say relates to actions by consumers or by competitors alleging other kinds of violations of the unfair competition law such as 'fraudulent' or 'unlawful' business practices or 'unfair, deceptive, untrue or misleading advertising.' " (*Id.* at p. 187, fn. 12.) Thus, the court chose to leave for another day whether this test of unfairness applies to consumer cases as well.

The Courts of Appeal have struggled with which test should apply in the wake of *Cel-Tech*. In *Smith v. State Farm Mutual Automobile Ins. Co.* (2001) 93 Cal.App.4th 700, 717–719 [113 Cal.Rptr.2d 399], the court used the original balancing test in a consumer action, concluding that the Supreme Court meant it when it said it was expressing no opinion on the application of the *Cel-Tech* test to consumer actions. In *Schnall v. Hertz Corp., supra,* 78 Cal.App.4th at pages 1166–1167, the appellate court adopted the *Cel-Tech* test in a consumer action concluding that an unfair business practice claim must be tethered to some " 'legislatively declared policy.' " Still other courts have failed to take a stance concluding that the unfair business practices before them offended either test. (*Pastoria v. Nationwide Ins., supra,* 112 Cal.App.4th at p. 1497.)

We conclude that the balancing test should continue to apply in consumer cases. In *Cel-Tech,* the Supreme Court declined to extend its more narrow test to consumer cases. Moreover, it has yet to do so in the six years since that decision was announced. In addition, we believe section 17200's "unfair" prong should be read more broadly in consumer cases because consumers are more vulnerable to unfair business practices than businesses and without the necessary resources to protect themselves from sharp practices. One of the major purposes of section 17200 is to protect consumers from nefarious business practices.

Here, the allegations of the complaint are that Progressive has a pattern and practice of demanding 100 percent of any moneys it pays out to its policyholders under the med-pay coverage without regard to the company's obligations under the made-whole rule or the common-fund doctrine. Further, Preciado alleges that Progressive misleads its policyholders and makes misrepresentations in connection with these activities. This alleged generalized practice fits the language often used in conjunction with unfair business practices as " 'immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers.' [Citation.]" (*Smith v. State Farm Mutual Automobile Ins. Co., supra,* 93 Cal.App.4th at p. 719.)

■ The balancing test required by the unfair business practice prong of section 17200 is fact intensive and is not conducive to resolution at the demurrer stage. " '[U]nfairness' is an equitable concept that cannot be mechanistically determined under the relatively rigid legal rules applicable to the sustaining or overruling of a demurrer." (*Schnall v. Hertz Corp., supra,* 78 Cal.App.4th at p. 1167.) The facts and evidence have not yet been adduced. Progressive has not yet had the opportunity to demonstrate its reasons, justifications, or motives for its conduct. Thus, we conclude the demurrer was properly overruled as to Preciado's cause of action for unfair competition.

C

*Unlawful Business Practices*

■ An unlawful business practice under section 17200 is " 'an act or practice, committed pursuant to business activity, that is at the same time *forbidden by law.* [Citation.]' " (*Bernardo v. Planned Parenthood Federation of America* (2004) 115 Cal.App.4th 322, 351 [9 Cal.Rptr.3d 197].)

Here, Preciado asserts his cross-complaint alleges a violation of Penal Code section 550, subdivision (b)(3). That section states, "(b) It is unlawful to do, or to knowingly assist or conspire with any person to do, any of the following: [¶] . . . [¶] (3) *Conceal,* or knowingly fail to disclose the occurrence of, an event that affects any person's initial or continued right or entitlement to any insurance benefit or payment, or *the amount of any benefit or payment to which the person is entitled.*" (Italics added.)

Preciado's cross-complaint does not allege that Progressive concealed the amount of benefits to which Preciado was entitled. It alleges that Progressive demanded more back from Preciado than it was entitled because of the operation of two separate equitable defenses. As we have explained, Progressive paid all of the benefits to Preciado to which he was entitled. Thus, the conduct alleged in the cross-complaint cannot be construed as concealing the amount of the benefits to which Preciado is entitled. No violation of this statute is pled in the cross-complaint.

Preciado further contends that his cross-complaint alleges that Progressive generally violates the court-made law of the common-fund doctrine and the requirements of the covenant of good faith and fair dealing. While this conduct may constitute fraudulent or unfair business practices, as framed by this cross-complaint, it does not rise to the level of an unlawful business practice. As we have already concluded, Preciado has not stated a cause of action for breach of the covenant of good faith and fair dealing against Progressive. Further, to the extent that these two common law doctrines apply

to Preciado's case, Preciado has not established there is a burden on Progressive to investigate the facts and circumstances of these doctrines and advise its insured on each of them. Thus, these allegations will not sustain a claim that Progressive breached these common law doctrines.

## DISPOSITION

The petition is granted in part and denied in part. The alternative writ, having served its purpose, is discharged. Let a writ of mandate issue commanding the superior court to vacate its order overruling the demurrer and in its place enter a new order sustaining the demurrer without leave to amend as to the first and second causes of action and overruling it as to the third cause of action. The parties shall bear their own costs. (Cal. Rules of Court, rule 56(l)(2).)

Blease, Acting P. J., and Sims, J., concurred.

A petition for a rehearing was denied January 17, 2006, and petitioner's petition for review by the Supreme Court was denied April 12, 2006, S140990. Werdegar, J., did not participate therein. Chin, J., was of the opinion that the petition should be granted.